# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.                                                     CASE NO.: 1:23-CR-00056-JKB

BRANDON CLINT RUSSELL.

---

## BRANDON RUSSELL'S MOTION TO COMPEL THE GOVERNMENT TO AFFIRM OR DENY SURVEILLANCE UNDER THE FOREIGN INTELLIGENCE SURVEILLANCE ACT, TO DISCLOSE ALL OF HIS COMMUNICATIONS SUBJECT TO THAT SURVEILLANCE, AND TO UNSEAL THE GOVERNMENT'S EX PARTE SUBMISSIONS AND THE COURT'S EX PARTE REPORT

Patrick Toomey*
Ashley Gorski*
Sara Robinson*
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street
New York, NY 10004
Tel: (212) 549-2500

Kobie A. Flowers (Bar No. 16511)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030

Ian J. Goldstein*
LAW OFFICES OF IAN GOLDSTEIN P.A.
330 Clematis Street, Suite 209
West Palm Beach, FL 33401
Tel: (561) 600-0950

*Admitted pro hac vice

Counsel for Brandon Russell

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................... 4

I.    Section 702 authorizes warrantless, dragnet surveillance of Americans. ............... 4

II.   Mr. Russell's communications were surveilled under Section 702. ....................... 5

ARGUMENT .................................................................................................................. 7

I.    The government must affirm or deny the surveillance of Mr. Russell under
      18 U.S.C. § 3504. ................................................................................................. 8

II.   Due process entitles Mr. Russell to notice of the Section 702 surveillance and
      disclosure of his intercepted communications. .................................................... 12

III.  Mr. Russell is entitled to notice under 50 U.S.C. § 1806(c). ............................... 17

      A.   The government's evidence is derived from Section 702 surveillance of
           Mr. Russell's communications. ..................................................................... 18

      B.   FISA's notice provision does not permit the government to secretly resolve
           suppression issues in its own favor. .............................................................. 19

      C.   Applying the canon of constitutional avoidance, Section 1806(c) must be
           interpreted to require notice here. ................................................................. 23

IV.   Rule 16 of the Federal Rules further requires the government to provide notice. ............... 24

V.    The Court has the power to compel the government to provide notice. ............... 24

VI.   The Court should unseal the government's ex parte submissions and the ex parte report.... 26

CONCLUSION ........................................................................................................... 29

CERTIFICATE OF SERVICE .................................................................................. 31

# TABLE OF AUTHORITIES

**Cases**

*Berger v. New York,*
388 U.S. 41 (1967) ..................................................................................................... 9, 13

*Bowen v. Mich. Acad. of Fam. Physicians,*
476 U.S. 667 (1986) ......................................................................................................... 24

*Brady v. Maryland,*
373 U.S. 83 (1963) ............................................................................................................ 14

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ......................................................................................................... 17

*Clark v. Martinez,*
543 U.S. 371 (2005) ......................................................................................................... 23

*Dalia v. United States,*
441 U.S. 238 (1979) ......................................................................................................... 14

*In re Askin,*
47 F.3d 100 (4th Cir. 1995) ............................................................................................ 10

*In re Evans,*
452 F.2d 1239 (D.C. Cir. 1971) ....................................................................................... 9

*In re Grand Jury Investigation,*
431 F. Supp. 2d 584 (E.D. Va. 2006) ............................................................................ 11

*In re Grand Jury Matter,*
683 F.2d 66 (3d Cir. 1982) ...................................................................................... 26, 29

*In re Grand Jury Proc.,*
524 F. Supp. 87 (E.D. Pa. 1981) .................................................................................... 10

*In re Grand Jury Subpoena (T-112),*
597 F.3d 189 (4th Cir. 2010) .......................................................................................... 10

*Jencks v. United States,*
353 U.S. 657 (1957) ......................................................................................................... 14

*Katz v. United States,*
389 U.S. 347 (1967) ........................................................................................................... 9

*Kolod v. United States,*
390 U.S. 136 (1968) ......................................................................................................... 21

*Marbury v. Madison,*
   5 U.S. (1 Cranch) 137 (1803) ................................................................................ 24

*Matter of Archuleta,*
   434 F. Supp. 325 (S.D.N.Y. 1977) ......................................................................... 10

*Matter of Grand Jury,*
   524 F.2d 209 (10th Cir. 1975) ................................................................................ 12

*McNabb v. United States,*
   318 U.S. 332 (1943) ................................................................................................ 25

*Murray v. United States,*
   487 U.S. 533 (1988) ................................................................................................ 13

*Nix v. Williams,*
   467 U.S. 431 (1984) ................................................................................................ 20

*Roviaro v. United States,*
   353 U.S. 53 (1957) ........................................................................................... 14, 28

*Shores v. United States,*
   174 F.2d 838 (8th Cir. 1949) .................................................................................. 25

*Smith v. Black,*
   904 F.2d 950 (5th Cir. 1990) .................................................................................. 13

*Strickland v. Washington,*
   466 U.S. 668 (1984) ................................................................................................ 29

*United States v. Alderman,*
   394 U.S. 165 (1969) ......................................................................................... *passim*

*United States v. Amawi,*
   695 F.3d 457 (6th Cir. 2012) .................................................................................. 14

*United States v. Apple,*
   915 F.2d 899 (4th Cir. 1990) ............................................................................ *passim*

*United States v. Aref,*
   533 F.3d 72 (2d Cir. 2008) ..................................................................................... 14

*United States v. Belfield,*
   692 F. 2d 141 (D.C. Cir. 1982) ................................................................ 1, 3, 12, 15

*United States v. Caro,*
   597 F.3d 608 (4th Cir. 2010) .................................................................................. 24

*United States v. Carter*,
No. 19-cr-819, 2020 WL 7490401 (N.D. Ill. Dec. 21, 2020) ...................................... 10, 12, 26

*United States v. D'Andrea*,
495 F.2d 1170 (3d Cir. 1974) ................................................................................... 10

*United States v. DiLorenzo*,
No. 94-cr-303, 1995 WL 169003 (S.D.N.Y. Apr. 10, 1995) .................................... 26

*United States v. Freitas*,
800 F.2d 1451 (9th Cir. 1986) ................................................................................. 14

*United States v. Gaines*,
668 F.3d 170 (4th Cir. 2012) ................................................................................... 21

*United States v. Gamez-Orduno*,
235 F.3d 453 (9th Cir. 2000) ................................................................................... 13

*United States v. Gorman*,
859 F.3d 706 (9th Cir. 2017) ................................................................................... 18

*United States v. Hasbajrami*,
945 F.3d 641 (2d Cir. 2019) ..................................................................................... 9

*United States v. Johns*,
891 F.2d 243 (9th Cir. 1989) ............................................................................. 18, 22

*United States v. Leon*,
468 U.S. 897 (1984) ................................................................................................ 15

*United States v. Lundin*,
817 F.3d 1151 (9th Cir. 2016) ................................................................................. 21

*United States v. Mejia*,
448 F.3d 436 (D.C. Cir. 2006) ................................................................................ 14

*United States v. Moalin*,
973 F.3d 977 (9th Cir. 2020) ................................................................................... 13

*United States v. Moussaoui*,
382 F.3d 453 (4th Cir. 2004) ............................................................................. 14, 28

*United States v. Najjar*,
300 F.3d 466 (4th Cir. 2002) ................................................................................... 22

*United States v. Nolte*,
39 F.R.D. 359 (N.D. Cal. 1965) .............................................................................. 25

*United States v. Osborne*,
   424 F. Supp. 70 (E.D. Pa. 1976) ................................................................... 10

*United States v. Ramirez-Sandoval*,
   872 F.2d 1392 (9th Cir. 1989) ..................................................................... 21

*United States v. Seidman*,
   156 F.3d 542 (4th Cir. 1998) ...................................................................... 18

*United States v. Soto-Zuniga*,
   837 F.3d 992 (9th Cir. 2016) ...................................................................... 24

*United States v. U.S. Dist. Court (Keith)*,
   407 U.S. 297 (1972)............................................................................. 16, 25

*United States v. Vielguth*,
   502 F.2d 1257 (9th Cir. 1974) ...................................................................... 9

*United States v. Weiner*,
   418 F. Supp. 941 (M.D. Pa. 1976) ............................................................... 11

*United States v. Weigand*,
   482 F. Supp. 3d 224 (S.D.N.Y. 2020), *as corrected* (Sept. 2, 2020)................ 26

*United States v. Wilford*,
   961 F. Supp. 2d 740 (D. Md. 2013) ............................................................. 26

*United States v. Williams*,
   615 F.3d 657 (6th Cir. 2010) ...................................................................... 21

*United States v. Yagman*,
   No. 06-cr-227, 2007 WL 9724370 (C.D. Cal. July 17, 2007) ......................... 26

*Wong Sun v. United States*,
   371 U.S. 471 (1963)............................................................................. 18, 21

## **Statutes**

18 U.S.C. § 2518.................................................................................................. 21

18 U.S.C. § 2703(b) ............................................................................................. 16

18 U.S.C. § 3504..................................................................................... *passim*

50 U.S.C. § 1801(e) ............................................................................................... 4

50 U.S.C. § 1806..................................................................................... *passim*

50 U.S.C. § 1881a .................................................................................... 1, 4, 5, 17

Classified Info. Proc. Act, 18 U.S.C. App. III ................................................ 27


**Other Authorities**

2 David Kris & J. Douglas Wilson, National Security Investigations and Prosecutions
    § 26:5 (3d ed. 2019, rev. 2023) ................................................................. 28

2 Fed. Prac. & Proc. Crim. § 254 (4th ed.) ................................................... 24

Human Rights Watch, *Dark Side: Secret Origins of Evidence in U.S. Criminal Cases*
    (Jan. 9, 2018), https://perma.cc/YWW2-3KRW ....................................... 17

Kaufman, Irving R., *Criminal Discovery and Inspection of Defendant's Own
    Statements in the Federal Courts*, 57 Colum. L. Rev. 1113 (1957) ............... 25

Press Release, *Maryland Woman and Florida Man Charged Federally for Conspiracy to
    Destroy Energy Facilities*, Dep't of Just. (Feb. 6, 2023), https://perma.cc/N3PS-8XP9 ....... 6, 7

Pub. Safety Can., *Currently Listed Entities*,
    https://perma.cc/R97U-P5H6 (last visited July 27, 2024) ............................ 7

*Report on the Surveillance Program Operated Pursuant to Section 702 of FISA*,
    Priv. & Civ. Lib. Oversight Bd. 58 (Sept. 28, 2023), https://perma.cc/8UGZ-9KPN .......... 4, 20

Savage, Charlie, *Door May Open for Challenge to Secret Wiretaps*, N.Y. Times,
    Oct. 16, 2013, https://nyti.ms/36ccH0G ................................................... 20

S. Rep. 95-701, 63, *as reprinted in* 1978 U.S.C.C.A.N. 3973 ......................... 2, 8

Taitz, Sarah & Patrick Toomey, *Concealing Surveillance: The Government's
    Disappearing Section 702 Notices*, Just Security (Sept. 27, 2023),
    https://perma.cc/WCR8-QBLJ ............................................................... 20

*The Scope of Criminal Discovery Against the Government*, 67 Harv. L. Rev. 492 (1954) .......... 26

U.K. Home Off., *Proscribed Terrorist Groups or Organisations* (Apr. 26, 2024),
    https://perma.cc/8VC5-X453 ................................................................. 7

United States Constitution, Article III ........................................................... 9

U.S. State Dep't, *Country Reports on Terrorism 2022: Australia*,
    https://perma.cc/28MS-VFNC (last visited July 27, 2024) ........................... 7

**<u>Rules</u>**

Fed. R. Crim. P. 16 ................................................................................................................. *passim*

D. Md. L.R. 207(2) ............................................................................................................. 27

Brandon Russell moves to compel the government to affirm or deny surveillance conducted under Section 702 of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1881a. On June 11, 2024, citing public statements by FBI Director Christopher Wray and a senior FBI official, Mr. Russell moved pursuant to FISA and the Constitution to compel the government to provide notice of Section 702 surveillance of his communications. *See* Mot., ECF No. 107. The Court denied Mr. Russell's Motion to Compel without prejudice. *See* Mem., ECF No. 134 at 12. On July 23, 2024, the Court held an ex parte, in camera conference with the government so it could provide an "answer to the question of whether it used Section 702 in any way in its investigation or prosecution of Defendant." Mem., ECF No. 143 at 3. The Court held that Mr. Russell is not entitled to notice under FISA, though its public discussion did not describe the factual or legal basis for that conclusion. *Id.*

Because the government has not provided notice under FISA, Mr. Russell now moves, for the first time, to compel the government to affirm or deny its use of Section 702 surveillance pursuant to 18 U.S.C. § 3504(a). Mr. Russell also moves, for the first time, for the disclosure of his communications intercepted pursuant to Section 702, as a matter of due process and as contemplated by *United States v. Belfield*, 692 F. 2d 141, 146 & n.22 (D.C. Cir. 1982). In addition, he seeks notice and disclosure pursuant to Rule 16 of the Federal Rules of Criminal Procedure, and he renews his motion for notice pursuant to the Constitution and FISA. He provides the following legal authority in support of this motion.[1]

## INTRODUCTION

Under statutory law, the Constitution, and the Federal Rules of Criminal Procedure, the government must disclose whether it surveilled Mr. Russell under Section 702 in its investigation.

---

[1] Given the government's position at the June 26, 2024 hearing, it opposes this motion.

As part of a campaign to support Congress's reauthorization of Section 702, FBI Director Christopher Wray and a senior FBI official publicly claimed that Section 702 surveillance was essential to thwarting an alleged plot. Together, their disclosures detailed eleven specific features of the alleged plot—including the nature of the plot, the means allegedly acquired to carry out the attack, and the alleged timeline of events. Those eleven details match the allegations in only one public federal criminal prosecution: this one. Given this close alignment, there is a clear basis to believe that the FBI used Section 702 surveillance against Mr. Russell.

Although the Court held, following an ex parte conference, that it is satisfied that the government will not use evidence in this case obtained or derived from Section 702 of Mr. Russell, the factual and legal bases for that conclusion remain under seal. Mr. Russell respectfully submits that, given the FBI's public disclosures, the government cannot withhold from the defense the fact of whether Mr. Russell was subject to Section 702 surveillance in this investigation. He moves here to compel the government to affirm or deny its Section 702 surveillance of his communications pursuant to 18 U.S.C. § 3504. Congress has made clear that, even where the government refuses to provide notice under FISA, an accused may nonetheless compel the government to disclose the fact of FISA surveillance under Section 3504. *See, e.g.*, S. Rep. 95-701, 63, *as reprinted in* 1978 U.S.C.C.A.N. 3973, 4032. If Mr. Russell was not subject to Section 702 surveillance, and FBI Director Wray was referring to surveillance of someone else, that would resolve the need for further suppression litigation on this issue. But if Mr. Russell was surveilled as FBI Director Wray described, he is entitled to challenge the lawfulness of that surveillance and to litigate the question of what evidence flowed from that surveillance.

Mr. Russell has satisfied the requirements of Section 3504: he has made a "claim" that the government's evidence is the product of unlawful Section 702 surveillance, and a colorable

2

showing that he was subject to this surveillance. Under Fourth Circuit precedent, that showing is more than sufficient to trigger the government's obligation to affirm or deny its use of Section 702 as to Mr. Russell.

Additional authorities independently require the government to provide notice and disclosure of Section 702 surveillance to Mr. Russell. Because the government maintains that its evidence was not obtained or derived from Section 702 surveillance, Mr. Russell is "[a]lternatively" moving, for the first time, for disclosure of his communications acquired under Section 702, as a matter of due process and as described by the D.C. Circuit in *United States v. Belfield*, 692 F. 2d 141, 146 & n.22 (D.C. Cir. 1982). Mr. Russell also renews his motion for notice pursuant to 50 U.S.C. § 1806(c) and the Constitution. *See* Mot., ECF No. 107; Mem., ECF No. 134 at 12 (denying motion to compel without prejudice). Because the Court's August 7, 2024 public memorandum does not describe how it interpreted or applied FISA's notice provision or Mr. Russell's due process rights, he addresses those issues in this renewed motion. Finally, the Federal Rules of Criminal Procedure require notice of Section 702 surveillance as material to Mr. Russell's defense and disclosure of his recorded statements.

As explained below, this Court has both the power and the duty to compel the government to provide notice and disclosure. To the extent the government secretly has taken or will take the position—notwithstanding the FBI's public statements—that its evidence is not "derived from" Section 702 surveillance of Mr. Russell, that claim requires adversarial proceedings.

What the government cannot do, consistent with due process, is preempt Mr. Russell's ability to seek suppression. It cannot decide unilaterally—or litigate ex parte—the complex legal and factual questions concerning whether its evidence is tainted by Section 702, or whether a doctrinal exception to the "fruit of the poisonous tree" doctrine applies. After the government

provides notice and after the Court adjudicates the legality of the surveillance, the Court will then determine which evidence is "derived from" unlawful surveillance at the suppression stage, with the benefit of adversarial litigation. *See* 50 U.S.C. § 1806(e), (g).

**BACKGROUND**

**I.      Section 702 authorizes warrantless, dragnet surveillance of Americans.**

The government uses Section 702 to warrantlessly intercept billions of communications sent and received by hundreds of thousands of individuals, including Americans. *See, e.g.*, *Report on the Surveillance Program Operated Pursuant to Section 702 of FISA*, Priv. & Civ. Lib. Oversight Bd. 58 (Sept. 28, 2023), https://perma.cc/8UGZ-9KPN (hereinafter, "PCLOB Report"). Under the statute, the government is authorized to "target" any non-U.S. person abroad who is likely to communicate "foreign intelligence information." 50 U.S.C. §§ 1881a(a), 1801(e). Targets need not be suspected of any wrongdoing. Because many of the targeted foreigners communicate with friends, family, business contacts, and others in the United States, the government's surveillance routinely sweeps up Americans whose communications are entitled to constitutional protection. 50 U.S.C § 1881a(a); PCLOB Report. The government stores the intercepted communications in databases, retains them for years, and searches them repeatedly for information about Americans—including in domestic criminal investigations. *See* PCLOB Report 78–79, 88, 93, 98–99. This surveillance takes place inside the United States, with the compelled assistance of major communications providers and technology companies. *Id.* at 2, 64–65.

All of this surveillance is conducted without a finding of probable cause, without a warrant, and without individualized judicial approval. With respect to U.S. persons, Section 702 allows the government not just to warrantlessly collect, but to retain, query, review, and use U.S. persons' communications with targeted persons. No court reviews the government's targets or approves the

4

government's subsequent use of this surveillance to investigate individual Americans. The Foreign

Intelligence Surveillance Court ("FISC") has only limited involvement, conducting an annual

review of the general procedures the government proposes to use. *See* 50 U.S.C. § 1881a.

## II.   Mr. Russell's communications were surveilled under Section 702.

Mr. Russell has ample reason to believe that his communications were both collected and

searched under Section 702 without a warrant. Earlier this year, as Congress debated whether to

reauthorize Section 702, the FBI made a set of extraordinarily rare public disclosures aimed at

showing the purported value of this surveillance. The disclosures appear in three sources:

(1) An article published by Politico in February 2024, which cites "newly declassified" information from a senior FBI official. *See* John Sakellariadis, *FBI Reveals Controversial Spy Tool Foiled Terror Plot as Congress Debates Overhaul*, Politico (Feb. 13, 2024), https://politi.co/3SPh5Op (Ex. A, Mot., ECF No. 107) ("Politico Article").

(2) A speech by FBI Director Wray on April 9, 2024, to the American Bar Association. *See Director Wray's Remarks to the ABA Standing Committee on Law and National Security*, FBI (Apr. 9, 2024), https://bit.ly/3X1ieoA (Ex. B, Mot., ECF No. 107) ("Wray Speech").

(3) An FBI news story describing FBI Director Wray's speech. *See Warrant Requirement for FBI's Section 702 Queries Would Impede Investigations*, FBI (Apr. 9, 2024), https://bit.ly/3WKnXO5 (Ex. C, Mot., ECF No. 107) ("FBI News Story").

The FBI's public disclosures conform precisely to the government's allegations in this

case. The FBI disclosed **eleven specific details** about the surveillance, all of which are present

here, as shown in the table below. Based on defense counsel's review of public federal criminal

dockets and Department of Justice press releases since January 2023, this is the only prosecution

that tracks each and every detail in the FBI's disclosures.

| No. | FBI Disclosures | Corresponding Allegations in this Case |
|---|---|---|
| 1. | *An alleged "terrorist" attack or plot*<br><br>Politico Article at 1–3, 5. | *The government refers to the prosecution as involving domestic "terrorism." [2]*<br><br>Press Release, *Maryland Woman and Florida Man Charged Federally for Conspiracy to Destroy Energy Facilities*, Dep't of Just. (Feb. 6, 2023), https://perma.cc/N3PS-8XP9. |
| 2. | *The alleged plot was to occur on "U.S. soil"*<br><br>Politico Article at 2; Wray Speech at 9. | *The government alleges the attack was aimed at electrical substations in Maryland.*<br><br>Aff. in Supp. of Crim. Compl., ECF No. 14-1 at 14, 22–25 ("Affidavit"); Stip. of Facts, Clendaniel Plea Agreement, ECF No. 93 at 4–5 ("Stip. of Facts"). |
| 3. | *Against "U.S. critical infrastructure"*<br><br>Politico Article at 2; Wray Speech at 9. | *Mr. Russell is charged with conspiracy to damage an energy facility.*<br><br>Indictment, ECF No. 25. |
| 4. | *Alleged plot foiled in 2023*<br><br>FBI News Story at 3; Politico Article at 2 ("last year"); Wray Speech at 9 (same). | *Mr. Russell was arrested on February 3, 2023.*<br><br>Arrest Warrant, No. 23-mj-1120, ECF No. 1 (M.D. Fla. Feb. 6, 2023). |
| 5. | *By "a person located inside the U.S."*<br><br>Politico Article at 3; Wray Speech at 9. | *Mr. Russell was located in the United States at the time of the alleged events.*<br><br>Aff.; Stip. of Facts. |
| 6. | *"specific targets in the U.S." had been identified*<br><br>Politico Article at 3; Wray Speech at 9. | *The government alleges five particular electrical substations had been identified.*<br><br>Aff. ¶¶ 14, 22–25; Stip. of Facts at 4–5. |
| 7. | *"who'd done relevant research and preparation"*<br><br>FBI News Story at 3; Wray Speech at 9. | *The government alleges Mr. Russell shared written and video materials on infrastructure attacks.*<br><br>Aff. ¶¶ 8–9, 11, 23–24. |

---

[2] Despite the very serious allegation of terrorism, the government did not charge Mr. Russell under any of the myriad terrorism statutes.

| 8. | *"acquired the means to conduct an attack"*<br><br>Politico Article at 3; Wray Speech at 9. | *The government alleges that Mr. Russell's co-defendant acquired firearms for the attack and that firearms and ammunition were recovered from her bedroom.*<br><br>Aff. ¶¶ 17–18; Stip. of Facts at 3–5. |
|---|---|---|
| 9. | *"regular contact with an unspecified foreign terrorist group"*<br><br><br><br>Politico Article at 3; Wray Speech at 9 (U.S. person had "been in touch with a foreign terrorist"); FBI News Story at 3 (same). | *The government alleges that Mr. Russell was involved in a group with "international ties" and that has been designated as a "terrorist group" by U.S. allies. Based on information available to the defense, Mr. Russell appears to have been in frequent communication with individuals located abroad prior to his arrest.*<br><br>Aff. ¶¶ 4–5; U.S. State Dep't, *Country Reports on Terrorism 2022: Australia*, https://perma.cc/28MS-VFNC (last visited July 27, 2024); Pub. Safety Can., *Currently Listed Entities*, https://perma.cc/R97U-P5H6 (last visited July 27, 2024); U.K. Home Off., *Proscribed Terrorist Groups or Organisations* (Apr. 26, 2024), https://perma.cc/8VC5-X453. |
| 10. | *Alleged plot was "potentially imminent"*<br><br>Politico Article at 1, 2, 5. | *The government alleges the plot involved a "time frame" or "no longer than a month."*<br><br>Aff. ¶ 14; Stip. of Facts at 3. |
| 11. | *Foiled "less than a month" after first uncovered*<br><br>Wray Speech at 9; FBI News Story at 3; Politico Article at 3 ("roughly 30 days"). | *The government alleges that it learned the particulars of the attack in January 2023 and Mr. Russell was arrested on February 3, 2023.*<br><br>Aff. ¶¶ 12–13; Stip. of Facts at 2; Press Release, *Maryland Woman Pleads Guilty to Conspiring to Destroy the Baltimore Region Power Grid*, Dep't of Justice (May 14, 2024), https://perma.cc/46GB-ZYYR (noting that the "plans began to culminate on Jan. 12, 2023"); Arrest Warrant. |

## ARGUMENT

The government is required to affirm or deny its Section 702 surveillance of Mr. Russell under 18 U.S.C. § 3504, and to provide notice and disclosure of the surveillance under the Fourth and Fifth Amendments to the Constitution, 50 U.S.C. § 1806(c), and Rule 16 of the Federal Rules of Criminal Procedure.

**I.   The government must affirm or deny the surveillance of Mr. Russell under 18 U.S.C. § 3504.**

Through 18 U.S.C. § 3504(a), Congress established the right to compel the government to affirm or deny whether it has conducted surveillance, based on a "claim" of unlawful surveillance by an "aggrieved" party. The statute provides:

> In any trial, hearing, or other proceeding . . . upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act[.]

18 U.S.C. § 3504(a). "Unlawful act" is defined as "the use of any electronic, mechanical, or other device" in violation of the law. *Id.* § 3504(b). Under the statute, the government is expressly required to "affirm or *deny*" such surveillance. 18 U.S.C. § 3504(a) (emphasis added).

When Congress enacted FISA, it recognized that individuals in criminal cases would rely on Section 3504 to learn of the government's use of FISA surveillance, including in scenarios where the government had not provided notice under FISA. *See* S. Rep. 95-701, 63, *as reprinted in* 1978 U.S.C.C.A.N. 3973, 4032 (describing use of 18 U.S.C. § 3504 in the FISA context).[3] Because Mr. Russell satisfies each element of the statute, the government must affirm or deny whether his communications were acquired pursuant to Section 702.

First, Mr. Russell "claim[s]" that evidence in this case was obtained by the exploitation of unlawful Section 702 surveillance and should be suppressed. *Id.* § 3504(a). Such a claim "need be no more than a 'mere assertion,' provided that it is a positive statement that illegal surveillance has taken place." *United States v. Apple*, 915 F.2d 899, 905 (4th Cir. 1990) (citation omitted). This is not a demanding requirement, due to the nature of surreptitious surveillance: "The government,

---

[3] As the Senate Report describes, if the government affirms its use of FISA surveillance under 18 U.S.C § 3504, the defense may then proceed to file a motion to suppress as provided in FISA. *See* S. Rep. 95-701, 63, *as reprinted in* 1978 U.S.C.C.A.N. 3973, 4032; 50 U.S.C. § 1806(e).

not appellants, has the information which can substantiate or dissolve their contentions, and for that reason Congress expected that the burden of going forward would shift to the government." *In re Evans*, 452 F.2d 1239, 1248–50 (D.C. Cir. 1971); *see also United States v. Vielguth*, 502 F.2d 1257, 1259 n.4 (9th Cir. 1974) ("Requiring more than a claim may encourage the development of more secretive means of illegal surveillance, rather than encourage elimination of such unlawful intrusions.").

Mr. Russell affirmatively states that the Section 702 surveillance of his communications was unlawful and that evidence in this case is inadmissible because it is the product of unlawful Section 702 surveillance or obtained by the exploitation of such surveillance. The warrantless search and seizure of his communications pursuant to Section 702 violates the Fourth Amendment's warrant requirement and is unreasonable. *See Katz v. United States*, 389 U.S. 347, 357 (1967) (searches conducted without a warrant are "per se unreasonable under the Fourth Amendment"); *Berger v. New York*, 388 U.S. 41, 58 (1967) (electronic surveillance is only reasonable when the eavesdropping is "precise and discriminate" and "carefully circumscribed so as to prevent unauthorized invasions" of privacy); *see also United States v. Hasbajrami*, 945 F.3d 641, 670 (2d Cir. 2019) (holding that querying Section 702 databases is "a separate Fourth Amendment event that, in itself, must be reasonable"). Section 702 surveillance also violates Article III of the Constitution. Under Section 702, the government asks the FISC to issue mass surveillance orders—resulting in the routine collection of Americans' communications—without any concrete factual showing. In other words, under Section 702, the FISC issues advisory opinions on broad legal questions in the absence of any "case or controversy."[4]

---

[4] Should the government affirm the occurrence of the surveillance, Mr. Russell would fully brief the illegality of Section 702 surveillance under both the Fourth Amendment and Article III of the

Section 3504 requires nothing more with respect to a "claim" that evidence is inadmissible, and the government's obligation to affirm or deny surveillance applies irrespective of its own views on the legality of its surveillance. *E.g.*, *In re Grand Jury Proc.*, 524 F. Supp. 87, 89 (E.D. Pa. 1981) (government's "opinion on the legality" of surveillance irrelevant). Thus, even where the government believes that its surveillance is lawful, it responds to Section 3504 motions by affirming or denying the fact of surveillance. *See, e.g.*, *In re Grand Jury Subpoena (T-112)*, 597 F.3d 189, 200 (4th Cir. 2010); *In re Askin*, 47 F.3d 100, 106 n.2 (4th Cir. 1995); *United States v. D'Andrea*, 495 F.2d 1170, 1173 (3d Cir. 1974).

Second, Mr. Russell is a "party aggrieved" under the statute. As the Fourth Circuit has held, to make the required showing, the movant need only have a "colorable basis" to believe that he was a party to an intercepted communication. *Apple*, 915 F.2d at 905. In cases such as this one, "[w]here the government does not admit illegal wiretapping," the movant can rely on "inference[s]" to establish that "colorable showing." *Matter of Archuleta*, 434 F. Supp. 325, 327 (S.D.N.Y. 1977); *see also United States v. Carter*, No. 19-cr-819, 2020 WL 7490401, at *4 (N.D. Ill. Dec. 21, 2020) (holding that "a reasonable inference from the omission of information in the government's disclosures" was sufficient under the statute); *United States v. Osborne*, 424 F. Supp. 70, 72 (E.D. Pa. 1976) (holding that the movant "clearly is a person aggrieved under the statute" given inferences from "clicking noises" on his phone and the police department's history of "using illegal electronic surveillance" more generally).[5]

---

Constitution as part of a motion to suppress. But for purposes of Section 3504 claims, only "a positive statement that illegal surveillance has taken place" is required. *Apple*, 915 F.2d at 905.

[5] In *Apple*, where the government had already confirmed that a particular device was subject to surveillance, the court required the movants to attest that they communicated via that device. *See* 915 F.2d at 907. But that step is inapplicable here because the government has not confirmed the device or account subject to surveillance.

Here, relying on specific and reasonable inferences, Mr. Russell has established more than a "colorable basis" to believe that he is aggrieved. *Apple*, 915 F.2d at 905. The eleven facts in the FBI's disclosures map precisely onto this case and only this case, based on defense counsel's review of public dockets. *See supra* Background. This showing is far more substantial than the "bare allegations" rejected by other courts. For example, in *In re Grand Jury Investigation*, 431 F. Supp. 2d 584, 591 (E.D. Va. 2006), the court held that general allegations about the existence of an NSA surveillance program and a movant's bare assertion that she was targeted were insufficient to show that the movants were aggrieved. *Id.* In contrast, here, Mr. Russell is not merely relying on the fact that the FBI engages in Section 702 surveillance or baldly claiming that he is a target; instead, he has made a specific, colorable showing based on particular facts in the FBI's disclosures and the absence of those allegations in other public prosecutions.

Finally, for the purposes of Section 3504, the government's views on whether its evidence is tainted are irrelevant. Because Mr. Russell has asserted that the government's evidence in this case is the product of unlawful Section 702 surveillance, and because he has made a colorable showing that he is aggrieved, the government "must 'affirm or deny'" the surveillance. *Apple*, 915 F.2d at 905. Only "then," after the government's response, should the Court proceed to consider taint. *Id.* at 906, 909–11 ("The district court abused its discretion when it ruled on the independent source issue before the government had adequately denied the occurrence of the alleged illegal surveillance."); *United States v. Weiner*, 418 F. Supp. 941, 946–47 (M.D. Pa. 1976) ("[T]he government's response should go to the existence of the unlawful activity itself, and should not be concerned with the connection such activity may have with the proceedings at issue."), *aff'd*, *United States v. Shinnick*, 546 F.2d 420 (3d Cir. 1976) (unpublished). Accordingly, the government must affirm or deny the occurrence of the surveillance under Section 3504.

Any denial of the occurrence of the surveillance must meet strict standards. The denial must "be given in absolute terms and by an authoritative officer," without any "ambivalent statements or loopholes." *Matter of Grand Jury*, 524 F.2d 209, 216 (10th Cir. 1975); *see also Apple*, 915 F.2d at 905–06 (considering whether a denial is adequate based on "the specificity and amount of information that forms the basis of the government's denial, the source or sources for that information, and the manner in which the information is presented to the court"); *Carter*, 2020 WL 7490401, at *4 ("The government must respond, under oath, and state conclusively whether it used [the surveillance] technique against Carter. . . . A lawyerly non-denial denial is insufficient.").

## II. Due process entitles Mr. Russell to notice of the Section 702 surveillance and disclosure of his intercepted communications.

Due process independently entitles Mr. Russell to notice of the government's Section 702 surveillance and disclosure of his intercepted communications. The D.C. Circuit has expressly held that "even when the Government has not purported to be offering any evidence obtained or derived from [FISA] surveillance" for the purposes of Section 1806(c), the accused may still pursue an "[a]lternative[]" path to litigate FISA surveillance. *Belfield*, 692 F.2d at 146. Specifically, as a matter of due process, the accused may "seek discovery of the logs of the overhears to ensure that no fruits thereof are being used against him." *Id.* at 146 & n.22 (citing *United States v. Alderman*, 394 U.S. 165 (1969)). In reaching this holding, the D.C. Circuit recognized that notice and disclosure of FISA surveillance is essential to the accused's due process rights. Accordingly, Mr. Russell hereby moves for notice and disclosure of any of his communications acquired or accessed by the FBI in the course of its investigation pursuant to Section 702.

Due process requires the government to provide Mr. Russell with notice and disclosure. Both are indispensable to bringing an informed motion to suppress. Without notice, Mr. Russell

cannot test whether the government's evidence was lawfully obtained or whether it was acquired in violation of the Fourth Amendment. Because notice is relevant and helpful to Mr. Russell's motion to suppress, and because its withholding could affect the outcome of a suppression hearing, due process requires notice here. Similarly, without disclosure, Mr. Russell cannot fairly litigate any government claim that its evidence was not the product of Section 702 surveillance, as the Supreme Court held in *Alderman*, 394 U.S. at 180–85.

Under the Fourth Amendment and the Due Process Clause of the Fifth Amendment, the accused must have a meaningful opportunity to pursue suppression of illegally acquired evidence. *See Murray v. United States*, 487 U.S. 533, 536–38 (1988) (describing right to seek suppression). Notice of surveillance is an obvious precondition to an informed motion to suppress. *See United States v. Moalin*, 973 F.3d 977, 1000 (9th Cir. 2020) ("[C]riminal defendants who have no knowledge that a potentially unconstitutional search has played a part in the government's case against them have no opportunity to vindicate any Fourth Amendment-protected rights through suppression."); *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."); *Smith v. Black*, 904 F.2d 950, 965–66 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992) (due process mandates the disclosure of information in the government's possession if nondisclosure would "affect[ ] the outcome of [a] suppression hearing").

In light of these bedrock principles, courts have long held that notice is a constitutionally required element of surreptitious searches like wiretaps and sneak-and-peek entries. *See Berger*, 388 U.S. at 60 (finding wiretapping statute unconstitutional because, among other things, it had

"no requirement for notice"); *Dalia v. United States*, 441 U.S. 238, 247–48 (1979) (Title III provides "a *constitutionally adequate* substitute for advance notice" by requiring notice after the surveillance is completed (emphasis added)); *United States v. Freitas*, 800 F.2d 1451, 1456 (9th Cir. 1986) (finding sneak-and-peek warrant constitutionally defective for its failure to provide notice within a reasonable time). In none of these cases did the courts suggest that the government may withhold notice on the theory that its trial evidence was not legally tainted. Rather, courts recognize that notice serves a constitutionally significant function in the context of secret surveillance—because, without notice, the accused would be deprived of a meaningful opportunity to seek suppression.

Due process also requires notice because it is "relevant and helpful" to the defense, even if the information is classified or subject to a government privilege. *See Roviaro v. United States*, 353 U.S. 53, 60–62 (1957); *United States v. Moussaoui*, 382 F.3d 453, 471–72 (4th Cir. 2004) ("[A] defendant becomes entitled to disclosure of classified information upon a showing that the information 'is relevant and helpful to the defense.'" (citation omitted)); *Jencks v. United States*, 353 U.S. 657, 671 (1957) (the government cannot invoke its privileges to "deprive the accused of anything which might be material to his defense"). In other words, due process entitles the accused to information—like the fact that Mr. Russell was subject to Section 702 surveillance—that is relevant and helpful to their arguments that evidence was obtained illegally and should be suppressed. *Roviaro*, 353 U.S. at 60–62; *see also United States v. Aref*, 533 F.3d 72, 80 (2d Cir. 2008) ("To be helpful or material to the defense, evidence need not rise to the level that would trigger the Government's obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory information."); *United States v. Amawi*, 695 F.3d 457, 471 (6th Cir. 2012) (same); *United States v. Mejia*, 448 F.3d 436, 456–57 (D.C. Cir. 2006) (same).

Thus, due process requires notice where, as here, the government has used a surveillance tool against a defendant, and the government's evidence is plausibly derived from that surveillance as a factual matter. It would never be appropriate for the government to withhold notice based on its theory that the exclusionary rule might not apply down the line. *See United States v. Leon*, 468 U.S. 897, 906 (1984) (Fourth Amendment violations and the exclusionary rule must be analyzed separately). The question of whether the government violated Mr. Russell's Fourth Amendment rights comes first. Notice is essential to fairly litigating that question.

Alongside notice of the surveillance, due process entitles Mr. Russell to disclosure of his communications that the FBI acquired or accessed in its investigation under Section 702. As the D.C. Circuit recognized in *Belfield*, disclosure of those communications is essential because, without that, the defense cannot fairly assess and litigate a closely related suppression issue: whether the government's evidence is a product of the surveillance. *Belfield*, 692 F.2d at 146. Indeed, *Belfield* recognized that even in scenarios where the government has not provided statutory notice of FISA surveillance, the accused could learn of the surveillance by demanding disclosure of their intercepted communications and seeking to litigate whether the "fruits" of that surveillance were being used in the prosecution, 692 F.2d at 146 & n.22, just as the Supreme Court prescribed in *Alderman*, 394 U.S. at 169.

*Alderman* was a watershed decision for criminal prosecutions involving surreptitious electronic surveillance, including those implicating "information relating to the national defense of the United States." 394 U.S. at 169. There, the government had proposed litigating Fourth Amendment taint issues by submitting surveillance records to the trial judge for in camera inspection, who would then disclose any records "arguably relevant" to petitioners' convictions. *Id*. at 181. But the Supreme Court rejected that proposal, holding that "surveillance records as to

15

which any petitioner has standing to object should be turned over to him"—regardless of whether the district court deemed them "arguably relevant" to the government's showing at trial. *Id.* at 182.

The core insight of *Alderman* was that electronic surveillance yields vast amounts of private information, which agents rely on in a variety of ways to further an investigation. Because of this complexity, only an adversarial process can ensure that courts accurately resolve the legal and factual questions of whether the government's evidence is the "fruit" of its surveillance. As the Court explained, "in our view the task is too complex, and the margin for error too great, to rely wholly on the in camera judgment of the trial court." *Id.* at 182 & n.14. Instead, to avoid leaving the trial court and defendants entirely reliant on the government's one-sided claims, adversarial proceedings are necessary "to provide the scrutiny which the Fourth Amendment exclusionary rule demands." *Id.* at 184; *see also United States v. U.S. Dist. Court (Keith)*, 407 U.S. 297, 324 (1972) (ordering disclosure of wiretaps in national security case to facilitate adversarial litigation under *Alderman*); *Apple*, 915 F.2d at 910 ("To compel a party who objects to the use of evidence obtained as a result of unlawful wiretapping to go forward with a showing of taint, and then to withhold from him the means or tools to meet that burden, is to create an absurdity in the law.").

Critically, given the many forms of electronic surveillance used today, it is not enough for the government to disclose Mr. Russell's communications without also providing specific notice of how they were obtained. In some cases, the government may obtain the same communications multiple ways—for example, first through Section 702 surveillance and then subsequently through a Stored Communications Act warrant. *See* 18 U.S.C. § 2703(b). This practice, often called "parallel construction," is used at times to conceal the use of novel or unlawful surveillance techniques in criminal proceedings, making it appear that a person's communications were

obtained solely through ordinary, uncontroversial legal process.[6] But under the due process principles described above, the government cannot withhold notice of the specific techniques it used—precisely because that information is essential to an informed motion to suppress and to fairly litigating the question of whether the government's evidence is the "fruit" of novel or unlawful surveillance methods.

## III.    Mr. Russell is entitled to notice under 50 U.S.C. § 1806(c).

Mr. Russell renews his motion for notice under 50 U.S.C. § 1806(c) to address points in the Court's decision and memorandum, *see* Mem., ECF No. 134; Mem., ECF No. 143, and to preserve his arguments for appellate review. Section 1806(c) of FISA provides: "Whenever the Government intends to enter into evidence or otherwise use or disclose" in "any . . . proceeding . . . against an aggrieved person, any information obtained or derived from an electronic surveillance of that aggrieved person pursuant to [Section 702], the Government shall . . . notify the aggrieved person and the court[.]" 50 U.S.C. § 1806(c); *see id.* § 1881e(a) (applying Section 1806 to Section 702 surveillance).

The Supreme Court has recognized that notice of Section 702 surveillance in criminal cases is essential to ensuring judicial review of this warrantless surveillance. In *Clapper v. Amnesty International USA*, the Supreme Court held that although the plaintiffs lacked standing, Section 702 was not insulated from judicial review in part because "if the Government intends to use or disclose information obtained or derived from a [Section 702] acquisition in judicial or administrative proceedings, it *must* provide advance notice of its intent, and the affected person may challenge the lawfulness of the acquisition." 568 U.S. 398, 421 (2013) (emphasis added).

---

[6] Human Rights Watch, *Dark Side: Secret Origins of Evidence in U.S. Criminal Cases* (Jan. 9, 2018), https://perma.cc/YWW2-3KRW.

Critically, the FBI claimed that it learned of the alleged plot and was able to intervene only *because of* the warrantless searches of its Section 702 databases. *See* Background *supra*. If Mr. Russell is indeed "aggrieved," the FBI's public disclosures provide a clear basis for notice under Section 1806(c). It would make a mockery of the notice requirement to allow the government to publicly proclaim that Section 702 surveillance was integral to this case, while simultaneously arguing to this Court that its evidence is not "derived from" Section 702.

### A.     The government's evidence is derived from Section 702 surveillance of Mr. Russell's communications.

Although the government's response to Mr. Russell's first motion for notice cited "five criteria" that must be met under Section 1806(c), ECF No. 110 at 2, this Court's analysis boils down to two questions: whether Mr. Russell was subject to Section 702 surveillance, and whether the government intends to use "information obtained or derived from" that surveillance of Mr. Russell. The FBI's disclosures make plain that the answer to both questions is yes.

As courts have long held, evidence is "derived" from surveillance whenever it is the direct or indirect product of that surveillance, including where there are intervening investigative steps. *See Wong Sun v. United States*, 371 U.S. 471, 484–89 (1963); *United States v. Seidman*, 156 F.3d 542, 548 (4th Cir. 1998). Additionally, evidence is derived from surveillance when the result of that surveillance "tends to significantly direct the investigation to the evidence in question." *United States v. Gorman*, 859 F.3d 706, 716 (9th Cir. 2017) (quoting *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989)).

Here, the FBI's disclosures make clear that the government's evidence is a product of Section 702 surveillance and that the collection and querying of Mr. Russell's communications significantly directed the investigation. First, the disclosures are emphatic that, in officials' view, Section 702 surveillance was what "thwarted" or "foil[ed]" the alleged plot in the first place. *See*

18

Politico Article at 1, 2 (making this point three separate times). Second, the FBI claims that its use of Section 702 is what revealed crucial details about the alleged attack. *See* Wray Speech at 9 ("Only by querying that U.S. person's identifiers in our 702 collection did we find important intelligence on the seriousness and urgency of the threat."); Politico Article at 5 ("the searches were what revealed an attack was imminent in the first place"); *id.* at 3 ("[T]he ability to search the Section 702 database without a court order showed that a person located inside the U.S. was in regular contact with an unspecified foreign terrorist group, had acquired the means to conduct an attack and had already identified specific targets in the U.S."). Third, the FBI asserted that it "almost definitely could not have recreated its success" without this type of surveillance. *Id.* at 4. And fourth, the FBI Director stated that the query of the Section 702 databases saved "valuable time," which was "needed to get ahead of the potential attack." Wray Speech at 9; Politico Article at 5 (using almost verbatim language).

Taken together, these factors show that central elements of the alleged plot were *first* discovered through Section 702 surveillance. As a result, there is little doubt that the evidence to be used at trial must have—at least in part—been a product of the Section 702 surveillance and that it "significantly directed" the investigation. That is enough to trigger the government's notice obligation under Section 1806(c).

> **B.    FISA's notice provision does not permit the government to secretly resolve suppression issues in its own favor.**

Based on the public record, the government appears to be relying on an unduly narrow interpretation of "derived from" in 50 U.S.C. § 1806(c) to withhold notice of Section 702 surveillance. Indeed, the government has a long history of asserting that it need not provide notice of FISA surveillance to the accused when, in its view, the accused would not prevail on a motion

to suppress.[7] But this argument wrongly conflates two distinct doctrinal issues: the standard for *notice* and the standard for *suppression*.

While it is true that Section 1806(c) uses the term "derived from," and some suppression decisions consider whether evidence is "derived from" a tainted source, the two standards are not interchangeable. In the context of a motion to suppress, "derived from" has a narrower meaning, because it does not merely ask whether evidence flowed from a tainted source as a factual matter. Rather, in the suppression context, "derived from" is a legal term of art that incorporates several doctrinal exceptions alongside the factual analysis of taint. *See, e.g.*, *Nix v. Williams*, 467 U.S. 431, 441–46 (1984). Thus, *at the suppression stage*, even when unlawful surveillance appears to have been a cause or source of the government's evidence, the government may argue that the evidence is not "derived from" the surveillance because, for example, the evidence is too attenuated from the surveillance, it obtained the evidence from an independent source, or it inevitably would have discovered the evidence.

But these exceptions to the "fruit of the poisonous tree" doctrine are entirely irrelevant to the analysis of whether *notice* is required. For three key reasons**,** Section 1806(c) does not incorporate exceptions to the exclusionary rule, and the government is wrong to argue otherwise.

---

[7] In 2013, the New York Times revealed that the Department of Justice ("DOJ") had "long used a narrow understanding of what 'derived from' means" to avoid giving notice of Section 702 surveillance in criminal cases. Charlie Savage, *Door May Open for Challenge to Secret Wiretaps*, N.Y. Times, Oct. 16, 2013, https://nyti.ms/36ccH0G. Although DOJ later modified its notice policy and gave notice to eleven people from 2013 to 2018, no criminal defendant has received notice of Section 702 surveillance since then. Sarah Taitz & Patrick Toomey, *Concealing Surveillance: The Government's Disappearing Section 702 Notices*, Just Security (Sept. 27, 2023), https://perma.cc/WCR8-QBLJ. This lack of notice is striking given that FBI agents have searched through Section 702 databases for Americans' communications *millions* of times over the same period, including in ordinary law enforcement investigations. *See* PCLOB Report at 98.

First, the government's argument would allow it to improperly thwart suppression litigation altogether, because notice is a precondition to an informed motion to suppress. Suppression litigation ordinarily proceeds in three phases: (1) a preliminary phase where the government provides notice to the accused; (2) adversarial litigation over the legality of the surveillance; and (3) if the surveillance is held unlawful, adversarial litigation over which evidence must be suppressed as tainted fruit of the surveillance. *See* 18 U.S.C. § 2518; 50 U.S.C. § 1806. But without notice, the accused would typically never realize that he was subject to secret FISA surveillance, and thus he would have no basis for knowing that he should exercise his constitutional right to seek suppression. This is why, as discussed *supra* Section II, courts have long held that notice is a constitutionally required element of surreptitious searches. If the legal standard for *providing notice* under Section 1806(c) were the same as the standard for assessing *whether evidence should be suppressed*, it would give the government far too much power to decide unilaterally that an exception to the fruit-of-the-poisonous-tree doctrine applies—short-circuiting both the accused's due process right to seek suppression and the court's suppression analysis.

The government's approach is also a problem for a practical reason: it is routinely wrong about whether evidence should be suppressed. With the benefit of adversarial litigation, courts often reject the government's arguments about whether its evidence is "derived from" a given search or surveillance at the suppression stage. *See, e.g.*, *Wong Sun*, 371 U.S. at 485–87; *United States v. Gaines*, 668 F.3d 170, 176 (4th Cir. 2012) (rejecting government's argument that an exception to fruit-of-the-poisonous tree doctrine applied); *United States v. Lundin*, 817 F.3d 1151, 1161–62 (9th Cir. 2016) (same);  *Johns*, 891 F.2d at 245–46 (same); *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989) (same); *United States v. Williams*, 615 F.3d 657, 671 (6th Cir. 2010) (same); *see also Kolod v. United States*, 390 U.S. 136 (1968) (per curiam)

(rejecting the government's unilateral determination that evidence was not derived from challenged surveillance and requiring adversarial proceedings).

Second, and relatedly, the question of whether the government's evidence is *factually* "derived from" Section 702 surveillance is distinct from the question of whether the government's evidence is *legally* tainted and should be suppressed. Indeed, the Fourth Circuit has recognized precisely this point, observing that "not all evidence conceivably derived from an illegal search need be suppressed if it is somehow attenuated enough from the violation to dissipate the taint." *United States v. Najjar*, 300 F.3d 466, 477 (4th Cir. 2002). Put differently, "derived from" is not synonymous with "legally tainted." *See also Johns*, 891 F.2d at 244 (recognizing that suppression turns on "whether evidence deriving from an illegal search is sufficiently tainted to require suppression"). Given the constitutional function of notice as a prerequisite to suppression litigation, "derived from" in Section 1806(c) must be read to focus on the *factual* relationship between surveillance and the government's evidence—without incorporating doctrinal exceptions to the fruit-of-the-poisonous-tree doctrine. It must be read to encompass plausible claims that, as a factual matter, the government's evidence was the direct or indirect product of Section 702 surveillance.

Third, for reasons explained above, the government's argument runs afoul of the Supreme Court's decision in *United States v. Alderman*, which held that litigation over whether the government's evidence is legally tainted must be adversarial. 394 U.S. at 180–85; *see supra* Section II. The government cannot determine in secret or litigate ex parte the question of whether its evidence is fruit of the poisonous tree.

Thus, to preserve Mr. Russell's ability to bring an informed motion to suppress, the meaning of "derived from" for the purpose of notice must be broader than what is "derived from"

Section 702 for the purpose of litigating taint and suppression. If the meaning of the two terms were identical, the "notice" and "taint" analyses would essentially collapse into one, leaving the accused entirely reliant on the government's self-serving analysis of taint and thwarting their due process rights, as explained in *Alderman*.

### C.   Applying the canon of constitutional avoidance, Section 1806(c) must be interpreted to require notice here.

Even if the Court were to conclude that "derived from" in Section 1806(c) is ambiguous, and that any narrow interpretation advanced by the government is also a plausible one, the canon of constitutional avoidance requires the Court to construe "derived from" more broadly to compel notice here. Where a court is "choosing between competing plausible interpretations of a statutory text," it must seek "to avoid the decision of constitutional questions." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). Because the government apparently views Section 1806(c) as the only source of its notice obligation, its crabbed interpretation of the statute raises serious constitutional questions, as it deprives Mr. Russell of his due process rights to bring an informed motion to suppress and to litigate taint issues in an adversarial setting. *See supra* Section II (discussing Mr. Russell's due process right to notice). Thus, to avoid adjudicating precisely what due process requires, the Court should interpret "derived from" in Section 1806(c) to require notice where, as here, it is plausible that some of the government's evidence would not exist but for Section 702 surveillance of Mr. Russell.[8]

---

[8] Notice in this context is typically a barebones, boilerplate statement that acknowledges the surveillance of the accused. *See, e.g.*, *United States v. Khan*, No. 12-cr-659, ECF No. 59 (D. Or. Apr. 3, 2014) (Section 702 notice). Nothing prevents the government from including in the notice an express reservation of its rights as to the "derived" analysis when litigating taint at the suppression stage of the proceedings.

IV.     **Rule 16 of the Federal Rules further requires the government to provide notice.**

Rule 16 of the Federal Rules of Criminal Procedure also compels the government to provide Mr. Russell with notice and disclosure of his recorded statements. Under Rule 16(a)(1)(E), Mr. Russell is entitled to information "material to preparing the defense." Because notice of the government's use of Section 702 is germane to Mr. Russell's ability to file an informed motion to suppress, this information is plainly "material" under the rule. *See United States v. Soto-Zuniga*, 837 F.3d 992, 1000 (9th Cir. 2016) (holding that Rule 16(a)(1)(E) applies to discovery "related to the constitutionality of a search or seizure"); *see also* 2 Fed. Prac. & Proc. Crim. § 254 (4th ed.) ("Too much should not be required in showing materiality."); *United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010) ("Rule 16 . . . is broader than *Brady*."). Moreover, under Rule 16(a)(1)(B), Mr. Russell is expressly entitled to discovery of his "recorded statement[s]," which include any intercepted communications to which he was a party. He is also entitled to such statements because they are items "obtained from or belong[ing] to" him under Rule 16(a)(1)(E).

V.     **The Court has the power to compel the government to provide notice.**

In denying Mr. Russell's prior Motion to Compel Notice, the Court raised a "threshold question" about "the extent to which this Court has the authority to compel the Government to produce a § 702 notice, or explain why such notice was not forthcoming, in a situation where the Government has stated on the record that it has determined that such notice is not warranted." Mem., ECF No. 134 at 11. The Court undoubtedly has such authority.

As a matter of first principles, where a court has jurisdiction, it has the power to examine whether the government has met its statutory and constitutional obligations in that proceeding, and to require the government to satisfy those duties. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."); *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 (1986) ("We ordinarily

presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.").

The Court's role in ensuring government compliance with its statutory and constitutional duties is especially critical in criminal cases where, as here, many of the government's obligations sound in due process. *See McNabb v. United States*, 318 U.S. 332, 343–44 (1943) ("A democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process. . . . A statute carrying such purposes is expressive of a general legislative policy to which courts should not be heedless when appropriate situations call for its application."); Irving R. Kaufman, *Criminal Discovery and Inspection of Defendant's Own Statements in the Federal Courts*, 57 Colum. L. Rev. 1113, 1121 (1957) ("If due process considerations are involved there must necessarily be some inherent authority in the federal courts to vindicate the constitutional guarantees by allowing discovery when dictated by compelling circumstances. . . . [C]ourts remain free to direct discovery under their inherent authority to administer criminal justice in federal courts.").

Even in cases implicating classified information and national security matters, the Court has the authority to compel the government to disclose to the accused information about surreptitious surveillance. *See, e.g.*, *Alderman*, 394 U.S. at 180–85 (requiring disclosure over the government's objection in national security case); *Keith*, 407 U.S. at 324 (same). More generally, the Court's inherent power allows it to compel disclosure of information—such as notice that a particular form of surveillance was used—even if the Court were to determine that such notice is not required by Rule 16 of the Federal Rules. *United States v. Nolte*, 39 F.R.D. 359, 360 (N.D. Cal. 1965) (collecting cases discussing courts' "inherent power" to compel discovery not covered by Rule 16); *see also Shores v. United States*, 174 F.2d 838, 845 (8th Cir. 1949); *The Scope of*

*Criminal Discovery Against the Government*, 67 Harv. L. Rev. 492, 499 (1954) ("Rule 57(b) can be read as . . . preserving [courts'] inherent power," including in cases involving discovery outside the scope of Rule 16).

Given these authorities, it is no surprise that courts routinely compel the government to provide the accused with an affirmance or denial of surveillance, even in cases where the government argues that notice is not required. *See, e.g.*, *In re Grand Jury Matter*, 683 F.2d 66, 69 (3d Cir. 1982) (holding that the government's ex parte, in camera denial of surveillance under Section 3504 was "procedurally deficient"); *Carter*, 2020 WL 7490401 (requiring the government to affirm or deny surveillance under 18 U.S.C § 3504; rejecting the government's argument that notice was not required); *United States v. DiLorenzo*, No. 94-cr-303, 1995 WL 169003, at *1, 10, 10 n.15 (S.D.N.Y. Apr. 10, 1995) (same); *United States v. Yagman*, No. 06-cr-227, 2007 WL 9724370, at *1, 4 (C.D. Cal. July 17, 2007) (same); *United States v. Qazi*, No. 12-cr-60298, ECF No. 77 (S.D. Fla. May 6, 2013), *vacated on other grounds by United States v. Qazi*, No. 12-cr-60298, ECF No. 245 (S.D. Fla. Sept. 5, 2014) (compelling notice under 50 U.S.C. § 1806(c), despite the government's contention that notice was not required). The same is true for disclosures under Rule 16. *See, e.g.*, *United States v. Wilford*, 961 F. Supp. 2d 740, 754–56 (D. Md. 2013), *aff'd,* 689 F. App'x 727 (4th Cir. 2017) (granting a discovery request under Rule 16 despite the government's argument that disclosure was not required); *United States v. Weigand*, 482 F. Supp. 3d 224, 243–46 (S.D.N.Y. 2020), *as corrected* (Sept. 2, 2020) (same).

## VI.   The Court should unseal the government's ex parte submissions and the ex parte report.

The Court should unseal the portions of the government's ex parte submissions and the ex parte report that relate to the acquisition, querying, or accessing of Mr. Russell's communications, including any factual or legal analysis. *See* Mem., ECF No. 143 (describing ex parte submissions

and report). In this request, Mr. Russell does not seek access to information about the surveillance of communications to which he was not a party.

Mr. Russell recognizes that he consented to an ex parte conference to facilitate the Court's understanding of the surveillance at issue, prior to further proceedings on FISA-related issues. *See* Mem., ECF No. 134 at 12 ("Defendant did not object to this proposal."). But Mr. Russell did not consent to any ex parte briefing of intertwined factual and legal issues, and he expressly contested any ex parte determination of "whether any evidence 'obtained or derived from' any electronic surveillance pursuant to § 702 contributed to the Government's investigation or prosecution of him." *Id.*; *see* Mot., ECF No. 107 at 12 (contesting that such determinations can be made on an ex parte basis); Reply, ECF No. 123 at 2–3, 10–12 (same). To the extent any of the materials submitted to the Court or created as a result of the ex parte conference describe the government's acquisition, querying, or accessing of Mr. Russell's communications—or address related legal issues—Mr. Russell opposes the continued withholding of such records from the defense.

The government has not presented any basis to justify the withholding of those materials from Mr. Russell. The government has not formally moved to seal those portions of the record, and thus has not adequately justified its effort to permanently keep them from the defense. *See* L.R. 207(2) (sealing requests must include "(a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection"). Although the government has apparently claimed that some of the information is classified, the government has not invoked the provisions of FISA or the Classified Information Procedures Act, 18 U.S.C. App. III ("CIPA"), in this case. Outside of those statutory frameworks, there is no free-floating entitlement to withhold classified information submitted to the Court in a criminal proceeding, given the due process and fair trial rights of the accused. *See* 2

27

David Kris & J. Douglas Wilson, National Security Investigations and Prosecutions § 26:5 (3d ed. 2019, rev. 2023) (observing that, "[s]tanding alone, the fact that information is classified does not excuse the government from producing it in discovery," and explaining that the government can declassify the information at issue or file motions under authorities like CIPA).

Moreover, it is far from clear that all the information under seal is as sensitive as the government claims. If Mr. Russell was not the person FBI Director Wray publicly described in his remarks, that fact is not properly classified. Conversely, if Mr. Russell *was* the person described by the FBI, and FBI Director Wray could disclose detailed information about how the FBI used Section 702 at an ABA luncheon, there is no reason the government cannot disclose comparable information to the defense in this criminal proceeding. The Court should scrutinize the government's claims about what it seeks to withhold, and should assess whether it can be properly withheld in the face of Mr. Russell's discovery and due process rights.

Mr. Russell is entitled to the ex parte materials that relate to the acquisition, querying, or accessing of his communications. As discussed *supra*, under Rule 16, Mr. Russell is entitled to discovery of his "recorded statement[s]" and items "obtained from or belong[ing] to him." *See* Fed. R. Crim. P. 16(a)(1)(B), 16(a)(1)(E). The materials must also be disclosed because they are "relevant and helpful" to the defense, even if the information is classified or subject to a government privilege. *See Moussaoui*, 382 F.3d at 471–72 ("[A] defendant becomes entitled to disclosure of classified information upon a showing that the information 'is relevant and helpful to the defense.'" (citation omitted)); *see also Roviaro*, 353 U.S. at 60–62; Fed. R. Crim. P. 16(a)(1)(E) (requiring disclosure of information "material to preparing the defense").

Moreover, in criminal proceedings, an adversarial process is of paramount importance to the accused's due process and fair trial rights. *See Strickland v. Washington*, 466 U.S. 668, 685

(1984) ("[A] fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding."); *Alderman*, 394 U.S. at 168, 182, 182 n.14, 184 (emphasizing the difficult judgments raised by "cases involving electronic surveillance," and holding that "in our view the task is too complex, and the margin for error too great, to rely wholly on the in camera judgment of the trial court"); *cf. In re Grand Jury Matter*, 683 F.2d at 69 (holding that an ex parte procedure is a "procedurally deficient" way to resolve an 18 U.S.C. § 3504 motion). To the extent the ex parte materials include factual or legal analysis about the role of surveillance in this case, Mr. Russell has not had any opportunity to address those specific claims. Providing him with those materials facilitates the adversarial process the Constitution requires.

The government's conclusory assertion that the information is classified does not override Mr. Russell's due process, fair trial, and discovery rights. The Court should unseal the portions of the records from the ex parte conference that relate—either factually or legally—to the surveillance of Mr. Russell's communications.

## CONCLUSION

For the foregoing reasons, Mr. Russell respectfully requests that this Court compel the government to provide notice of its Section 702 surveillance of his communications or otherwise affirm or deny the surveillance. Mr. Russell also requests that the government disclose all of his communications that were the product of such surveillance. Mr. Russell further requests that the Court unseal the portions of the materials and report from the July 23, 2024 ex parte conference that relate to the government's Section 702 surveillance of him.

Dated: August 14, 2024

Respectfully submitted,

/s/ Patrick Toomey
Patrick Toomey*
Ashley Gorski*
Sara Robinson*
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
125 Broad Street
New York, NY 10004
Tel: (212) 549-2500

Kobie A. Flowers (Bar No. 16511)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030

Ian J. Goldstein*
LAW OFFICES OF IAN GOLDSTEIN P.A.
330 Clematis Street, Suite 209
West Palm Beach, FL 33401
Tel: (561) 600-0950

*Admitted pro hac vice

*Counsel for Brandon Russell*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was electronically filed via CM/ECF which will serve all parties of record on this 14th day of August, 2024.

Respectfully submitted,

/s/ Patrick Toomey
Patrick Toomey (Admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street
New York, NY 10004
Tel: (212) 549-2500

31