**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **BRANDON RUSSELL** | * | **CRIMINAL NO. JKB-23-0056** |
| | * | |
| **Defendant.** | * | |
| | * | |

**\*\*\*\*\*\*\***

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
**MOTION IN LIMINE TO EXCLUDE 404(B) EVIDENCE AND REFERENCES TO NEO-**
**NAZISM OR THE ATOMWAFFEN DIVISION**

The United States of America, by and through undersigned counsel, hereby responds in opposition to Defendant's Motion in Limine to Exclude 404(b) Evidence and References to Neo-Nazism or the Atomwaffen Division at ECF 178. At the outset, the various acts of the defendant that are the subject of the notice, pursuant to Federal Rule of Evidence 404(b), are relevant and intrinsic to the offense for which the defendant is charged. The notice was provided merely in an abundance of caution.

Despite this fact, the acts are otherwise covered by 404(b), and the notice more than adequately satisfies the requirements of 404(b)(3). Specifically, thirteen (13) specific acts, comprised of statements or posts, were identified that reflected evidence of the defendant's "motive, intent, preparation, plan, knowledge, and absence of mistake in joining the conspiracy to attack electrical facilities in Maryland."

Because the acts are intrinsic or otherwise covered under 404(b), and the defendant is aware of the nature of the acts and why they are being offered, the motion should be denied.

1

# BACKGROUND

## 1. Factual Background

The defendant, Brandon Clint Russell, was a founding member of a National Socialist Group called the "Atomwaffen Division," which advocated for racially or ethnically motivated violence. Beginning in about 2018, the defendant and his coconspirator, Sarah Beth Clendaniel, became acquainted by writing letters to each other when both were serving prison sentences in different institutions.[1] At some point, they developed a romantic relationship that continued after their respective releases from incarceration.

The defendant and Clendaniel espoused a white supremacist ideology and were advocates of a concept known as "accelerationism." To "accelerate" or to support "accelerationism" is based on a white supremacist belief that the current system is irreparable and without an apparent political solution, and therefore violent action is necessary to precipitate societal and government collapse and start a race war.

Beginning in about June 2022, the defendant, using the moniker "Homunculus," communicated over an encrypted communication application (ECA #1) with a Confidential Human Source ("CHS-1"). Among other things, the defendant encouraged CHS-1 to carry out attacks against critical infrastructure in furtherance of the defendant's accelerationist ideology. He specifically encouraged CHS-1 to attack electrical substations and provided guidance on how to cause maximum damage, including as follows:

---

[1] The defendant pleaded guilty to possession of an unregistered destructive device, in violation of 26 U.S.C. §§ 5841 & 5861(d), and improper storage of explosive materials, in violation of 18 U.S.C. § 842(j). *See* MDFL Case No. 17-cr-00283-SCB-JSS. On January 9, 2018, the defendant was sentenced to 60 months in prison, to be followed by 3 years of supervised release.

- On September 9, 2022, the defendant told CHS-1 to read a white supremacist publication that provided instructions on how to attack critical infrastructure. The defendant urged CHS-1 to use Mylar balloons to short out a power transformer;

- On October 14, 2022, the defendant again talked to CHS-1 about the use of Mylar balloons for engaging in an attack on infrastructure. He then told CHS-1 that "putting holes in transformers though is the greatest thing somebody can do;"

- On October 25, 2022, after CHS-1 had provided the defendant with photographs of an electrical substation, the defendant stated that transformers are "custom made and could take almost a year to replace if there isnt [sic] any stocked replacement which they liekly [sic] don't have." In that same conversation, the defendant sent CHS-1 a link to the Wikipedia page for "Cascading failure." the defendant went on to ask CHS-1 how cold it gets in CHS-1's area, and indicated that CHS-1 should carry out an attack "when there is greatest strain on the grid," like "when everyone is using electricity to either heat or cool their homes;" and

- On November 5, 2022, the defendant asked CHS-1 if it was snowing in CHS-1's area yet and added: "i think you should wait until like a week after it starts snowing for that other thing we talked about." CHS-1 reported that the "other thing" was a reference to an attack on an electrical substation. The defendant also stated that the "goal is for when most people are using max electricity" and that "follow on [attacks] could lead to cascading failure costing billions of dollars." CHS-1 replied with an emoji of a shocked rubber duck.

On December 3, 2022, the defendant told CHS-1, "someone else i know in maryland…is gonna be doing same thing as you" and that this would "GREATLY amplify its effects." During

the same conversation, the defendant confirmed he was referring to the "thing [CHS-1] sent pictures about," a reference to the photographs of an electrical substation provided by CHS-1 in late October.

On January 12, 2023, CHS-1 discussed the planned substation attack and told the defendant that CHS-1 wanted to "maximize impact" and "[w]ould love to coordinate to get multiple [substations] at the same time." CHS-1 also alluded to the concept of cascading failure that the defendant had explained to CHS-1 during previous conversations. The defendant asked CHS-1 to collaborate with a Maryland-based woman to carry out the attacks and confirmed that the woman was 100 percent "serious and can be trusted." The defendant said that the woman was a "felon" who "had their weapon stolen" and was struggling to obtain a new weapon. The defendant asked CHS-1 to assist the woman the new weapon. The woman that the defendant referred to in this conversation, as well as in the December 3, 2022, conversation described above, was Sarah Beth Clendaniel.

Later that same day, Clendaniel, using the moniker "Nythra88," sent a message to CHS-1 on ECA #1. Clendaniel confirmed that she was the individual the defendant was referring to in the previous conversation between the defendant and CHS-1. In the ensuing conversation, which continued through January 14, 2023, Clendaniel told CHS-1 that she lived near Baltimore, that she had a terminal illness related to her kidneys and was unlikely to live more than a few months. She also stated that she was a felon, and had previously, but unsuccessfully, attempted to obtain a rifle. Clendaniel asked CHS-1 to purchase a rifle for her, stating that she wanted to "accomplish something worthwhile" before her death, and that she wanted the rifle "within the next couple of weeks" to "accomplish as much as possible before June, at the latest." Clendaniel then gave CHS-1 her username, @kali1889, for a different encrypted communication application ("ECA #2"), and

said that they should have further communications using that application or that they should communicate in person.

On January 18, 2023, on ECA #2, Clendaniel told CHS-1 that she had already identified a few potential locations to target in her attack, including one just across the Delaware state line (with Maryland), in a location that is "literally like a life artery" and would "definitely cut out a lot of shit." When Clendaniel told CHS-1 that she had just obtained her driver's license "today" and was not comfortable driving yet, CHS-1 stated that CHS-1 would have to be the "driver" and Clendaniel would have to be the "shooter" in the attack. Clendaniel confirmed that she was "determined to do this" and stated she would have done something earlier on her own if she had not lost her rifle "a few months ago." Clendaniel also told CHS-1 that she had an "eotech with a 4 times magnifier," which CHS-1 assessed to be a rifle optic, and that she had previously tried to obtain a rifle, a Smith & Wesson M&P 10 Sport, but that had fallen through. Clendaniel further stated that if CHS-1 provided her a rifle, CHS-1 should report the rifle as stolen and she would then file off the serial number. Clendaniel emphasized that her time frame for the attack was "no longer than a month."

The conversation continued shortly afterwards on ECA #1 after the ECA #2 call experienced technical problems. CHS-1 and Clendaniel continued to discuss the specifics of the desired rifle and agreed that Clendaniel would send CHS-1 a "wish list." Clendaniel admitted that whatever type of firearms she possessed would be "illegal." On or about January 19, 2023, Clendaniel sent CHS-1 a wish list of items for her desired rifle that were available for online purchase, along with magazines.

On or about January 19, 2023, the defendant and CHS-1 discussed on the telephone CHS-1's conversation the prior day with Clendaniel, including her ability to participate in the attack due

to her health problems and possibilities regarding acquiring or manufacturing a rifle for her. The defendant told CHS-1 that he did not think CHS-1 and Clendaniel needed to be together at the same location during the attack. When CHS-1 asked whether they would need to attack substations near one other in order to achieve "cascading failure," the defendant said it "depends." The defendant further stated that he would "look at the map" and get back to CHS-1 about target facilities in a couple of days.

On January 21, 2023, CHS-1 exchanged encrypted messages, separately, with Clendaniel on ECA #2 and the defendant on ECA #1 in which they discussed in more detail the rifle and specific accessories that Clendaniel wanted. The conversation with Clendaniel extended into January 22, 2023, at which time Clendaniel stated that she already had a "bunch of [.308] ammunition" and several magazines for a rifle. Clendaniel later clarified that she had a "few hundred rounds of ammunition." She also asked CHS-1 to provide her a "decent inner pants holster" for her "9mm" to replace her "other holster" which was a "drop leg holster" and therefore difficult to conceal.

On or about January 24, 2023, CHS-1 engaged in a nearly two-hour long conversation with Clendaniel. During the call, they discussed, among other things, the following:

- Clendaniel stated that she had threaded and non-threaded barrels for her Glock, which was functional after she purchased a new "slide" for it, and that she "keep[s] it on me now, like just in case." Clendaniel said she would send a picture of it to CHS-1 in the next day or two.

- Clendaniel discussed the ammunition she possessed, including .308 "full metal jacket" rounds, hollow point nine-millimeter rounds, and approximately 150-200 rounds of "Browning and Winchester." She also stated that she had a "Tri-Star" semi-automatic

shotgun with a 10-round magazine that she could use instead of the desired rifle in the "worst case scenario."

- Clendaniel stated that her brother had some "incendiary rounds" with a green tip. Clendaniel suggested that, although the rounds were expensive, "getting that is, uh, I think especially for what we're talking about doing, just to make sure it's a solid thing and not just like the oil leaking out but like it's fully damaged."

- Clendaniel stated that she and CHS-1 needed to use "brass catchers," and she had thought about going to the firearms range to collect shells of different calibers, including .556, that they could spread "there" to send "them" on a wild goose chase.

- Clendaniel stated that she was hesitant to discuss targets of the attack with "Raccoon" (another alias for the defendant) because "he has a lot to lose." She added: "He's not like your average regular one of us that's not known and that's like a faceless unknown person . . . I try not to involve him wherever possible." Clendaniel and CHS-1 discussed physically scoping out some potential attack sites during the first week of February.

- Clendaniel and CHS-1 further discussed Clendaniel's desired rifle for the attack.

On or about January 26, 2023, CHS-1 and the defendant exchanged direct messages on ECA #1 during which CHS-1 advised CHS-1 had tentatively decided to buy a "pre-made" rifle for Clendaniel instead of 3D printing one. The defendant replied: "okay sounds good . . . everything else is fine too ;)'" When CHS-1 asked if the defendant was referring to "location," meaning the specific substation that would be targeted, the defendant replied "yes don't worry." CHS-1 stated: "Perfect. That's the part that I haven't really done anything on," to which the defendant again replied: "yea don't worry."

On or about January 29, 2023, CHS-1 received a message on ECA #2 from Clendaniel in which she stated that it "would really be ideal, for us both to have 30 round mags. Especially for what we're doing." She asked CHS-1 to "please get us each like, 4 of them. For what I'm hoping to do, we will need them. If we can pull off what I'm hoping... this would be legendary. This is MAJOR tier, and definitely doable."

That same day, Clendaniel sent CHS-1 via ECA #2 a link to the publicly available webpage "Open Infrastructure Map" (https://openinframap.org) and instructed CHS-1 to "look at Baltimore and see if you can figure out what I want to do."

Later on January 29, 2023, Clendaniel told CHS-1 that the five substations she planned to target included: "Norrisville, Reisterstown, and Perry Hall." Clendaniel described how there was a "ring" around Baltimore and if they hit a number of them all in the same day, they "would completely destroy this whole city." She added that they needed to "destroy those cores, not just leak the oil…" and that a "good four or five shots through the center of them . . . should make that happen." Further, she stated that: "[i]t would probably permanently completely lay this city to waste if we could do that successfully." When CHS-1 asked if it would accomplish a "cascading failure," Clendaniel replied: "Yes . . . probably" and that the attack targets are all "major ones." Clendaniel also said that the most difficult target that they would have to do together has "fire walls on three sides."

During that conversation, Clendaniel sent CHS-1 five links to the "Open Infrastructure Map" which showed the locations of five specific Baltimore, Gas and Electric ("BGE") electrical substations in Maryland. BGE is an energy company that utilizes substations, like the five targeted sites, to produce, convert, transform, regulate and distribute energy. Three of the five substations were located near the towns of Norrisville, Reisterstown, and Perry Hall. The remaining two

substations were in the vicinity of Baltimore City, MD. Each location is a BGE substation with significant infrastructure.

On or about January 31, 2023, CHS-1 and the defendant discussed the targeted substations on ECA #1. CHS-1 told the defendant that CHS-1 had "read about a few attempt [sic] recently that didn't have much effect, so I want to make sure it's done right." The defendant replied "Yea, it has been studied . . . So don't fret." When CHS-1 asked "[t]hese specific 5?," the defendant replied: "Look at the map dude." CHS-1 responded: "So that's the part I don't get. What's with the one all the way up by Pennsylvania? Does that have something to do with the cascading?" The defendant replied: "Watch this video" and provided a YouTube link to a video captioned "Grid vs. Gunfire" that discussed "What Really Happened with the Substation Attack in North Carolina." After watching the video, CHS-1 commented that CHS-1 is looking at the map and "I think I get it . . . But I only see four lines. Not fully getting the fifth. Is the one up north to stop rerouting? You know the one I'm talking about?" The defendant replied: "Yrs [sic]… It's a hard one though . . . Look at it from google maps." After indicating CHS-1 had pulled the location up on the map, CHS-1 replied "It looks like it's in a pretty rural area . . . Good road access . . . Wooded areas . . . I would like it to be closer to a major highway, but that has its ups and downs. The defendant replied: "Yea . . . Hard part is they have 3 sided firewalls . . . Look at them." CHS-1 replied: "Oh shit. Yea this is that one. Our friend mentioned that one did but she didn't say which one." Clendaniel and The defendant believed that attacking these five electrical substations in the greater Baltimore area would serve the purpose of accelerationism, i.e., the attack would serve to break down society, start a race war, and allow a white ethnostate to be built back in its place.

## 2. Procedural Background

On February 3, 2023, federal agents conducted a search of the defendant and his home, and placed him under arrest. As a result of that search, numerous devices belonging to the defendant were seized and searched, including a cellular phone, an external hard drive, a USB drive, a laptop, several nazi/white nationalist artifacts, several drawings depicting nazi/white nationalist imagery, several photographs of Clendaniel, Neo-Nazi literature, various letters written by Clendaniel and addressed to the defendant, and a handwritten autobiography of the defendant, among other things.

Contemporaneous to the defendant's search and arrest, federal agents conducted a search of Clendaniel and her home, and she was ultimately arrested. The searches yielded multiple cellular phones, a laptop, multiple varieties of firearm ammunition and firearms accessories,[2] and various letters addressed to the defendant.

On February 14, 2023, the grand jury returned a one count Indictment against the defendants, charging them with conspiracy to damage an energy facility in violation of 18 U.S.C. § 1366(a).

Several productions of discovery have been provided to the defendant since that time. On May 8, 2024, counsel for the government provided discovery that was accompanied with a letter detailing its contents, and further provided notice of the government's intention to seek the admission of thirteen acts as relevant conduct under Federal Rule of Evidence 404(b). *See* Exhibit 1 (Notice).[3] The government further supplemented the notice two days later, on May 10, 2024, and noted the following, "[a]lthough we believe that this evidence is intrinsic to the pending

---

[2] As referenced in Clendaniel's communication with CHS-1 on January, 18, 2023, an EOTech Holographic Hybrid Sight was located during this time.

[3] The notice has been extracted from the discovery letter, however, it remains in the same substance and format.

charge, we are providing this notice pursuant to FRE 404(b) out of an abundance of caution." *See* Exhibit 2 (Supplemental Notice).[4]

<u>**ARGUMENT**</u>

**1.    The Acts are Intrinsic to the Crimes Charged, and are Inextricably Intertwined with the Defendant's Association with the Atomwaffen Division and Neo-Nazi Ideology.**

**a.    The Acts of the Defendant are at the Heart of the Conspiracy.**

The Government respectfully requests that the Court deny the defendant's Motion to Exclude 404(b)—as discussed above. The acts are intrinsic to the conspiracy, and reflect the conspiracy's long term goal to carry out attacks against critical infrastructure in furtherance of the defendant's racially motivated violent extremist beliefs.

"Rule 404(b) limits only the admission of evidence of acts extrinsic to the one charged, but does not limit the admission of evidence of intrinsic acts." *United States v. Lightly*, 616 F.3d 321, 352 (4th Cir. 2010). Prior-acts evidence is intrinsic if it "arose out of the same series of transactions as the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Kennedy*, 32 F.3d 875, 885 (4th Cir. 1994) (quotation omitted). Similarly, "[o]ther criminal acts are intrinsic when they are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *United States v. Chin*, 83 F.3d 83, at 87-88 (4th Cir. 1996) (internal quotation and citation omitted). Such "intrinsic act" evidence is ordinarily admissible as a matter of course.

The standard of intrinsic evidence is easily met here. To establish the charged conspiracy, the government must prove that the defendant entered into an unlawful agreement to knowingly

---

[4] This notice has been extracted verbatim as well.

damage the property of an energy facility, and that he knowingly and willfully became a member of the agreement.  The acts of the defendant go to the heart of the defendant's knowledge and willfulness to both enter into the agreement and to attack the targeted electrical substations. They further illuminate the defendant's motivation to do so.

To start, these acts were all taken from various online social media chats devoted to inspiring and acting in furtherance of Neo-Nazi causes, and during a time that immediately preceded the charged conspiracy. For several months leading up to January 2023, the defendant repeatedly communicated with members of these chats, including CHS-1 and Clendaniel about methods and means of carrying out his broader goal of destroying critical infrastructure.

Some messages contained more direct threats of violence, like statements literally imploring others to shoot at substations. *See* Ex. 1 at ¶¶ A, G, and J. Others were more veiled, like the defendant's repeated posts of "openrailwaymap.org" or "openinframap.org," which contained the locations of rail lines and electrical substations throughout the world. *Id*. at ¶¶ C, D, E, I, K, L, and M. These posts referenced "revolution" and stated, "[w]ould be a shame if someone turned the power off for the whole city."  *Id*. at ¶¶ D and K. Implicit in those posts were the defendant's desire to have others attack those areas of infrastructure. Others discussed the use of mylar balloons to destroy electrical infrastructure. *Id*. at ¶¶ F and H.

Each act provides more insight into the motivations of the defendant in ultimately conspiring with Clendaniel to destroy energy facilities, and the various methods that he would employ to do so. These acts are material and probative of the defendant's conduct in this case.

The defense view of the relevance of these acts is too narrow. Destroying electrical substations were means to an end. As is clear here, destroying critical infrastructure was the broader goal of the conspiracy and was reflected in each of the acts of the defendant.

Moreover, the fact that these acts predate the charged dates of the conspiracy is of no consequence. They are "necessary preliminaries to the crime charged," as they reflect the intention of the defendant to find likeminded individuals to perform the goals and directives of the conspiracy. To limit the government's use of this otherwise relevant evidence would be akin to limiting electronic evidence of planning related to a bank robbery.

There is no concern that such evidence is extrinsic, nor is such intrinsic evidence unfairly prejudicial.  Intrinsic and extrinsic evidence are subject to Fed. R. Evid. 403, which excludes relevant evidence if its probative value is "substantially outweighed" by the danger of unfair prejudice.  *United States v. Blauvelt*, 638 F.3d 281, 292 (4th Cir. 2011).  "Unfair prejudice" is an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.  *Old Chief v. United States*, 519 U.S. 172, 180 (1997).  Because the admission of relevant evidence is encouraged, exclusion under Rule 403 is rarely warranted.  *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007).  Indeed, the admission of evidence does not result in unfair prejudice under Fed. R. Evid. 403 where it does not involve conduct any more sensational or disturbing than the crimes with which the defendant was charged.  *See, e.g., United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995); *United State v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992); *United States v. Roldan Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).  Here, the acts refer to either the exact conduct the defendant is charged with, or similar conduct intended to elicit his desired result of a "cascading failure." The evidence is intrinsic and should be admitted.

**b. Evidence of Neo-Nazi Views and Atomwaffen Division Membership Further Illustrate the Defendant's Dedication to Accelerate the Decline of Society.[5]**

The evidence uncovered during the execution of the search warrants of the defendant's electronic devices and home further illustrate the pervasiveness of the defendant's neo-Nazi beliefs and his membership within the Atomwaffen Division. When considered within the context of the crimes charged, these facts are relevant, and impossible to avoid.

Much of the government's evidence is derived from the defendant's posting and reposting of neo-Nazi ideology that advocates the fall of society through accelerationism. One of the acts noticed to the defense includes a document titled, "Make It Count: A Guide for the 21st Century Accelerationist," that is comprised of fourteen pages. Ex. 1 at ¶ B. It provides, in pertinent part,

> The main thing that keeps the anti-White System going is the powergrid. The system with all its technology and computerization cannot continue to exert anywhere near the level of authority it currently does without the powergrid functioning intact. This is something that is easier than you think. Peppered all over the country are power distribution substations that electricity flowing all over the country. Sitting ducks, worthy prey. They are largely unprotected and often in remote locations. They can be struck at with easy [sic], and it can be done without getting caught, allowing for multiple to be hit in a spree.

Imagery within "Make It Count" includes multiple swastikas, a bullseye trained on a Jewish politician, and what appears to be photographs of dead bodies at a concentration camp during World War II. Here, the defendant has so inextricably intertwined the concepts of accelerationism and neo-Nazism, it would be impossible to separate them and present the case in a cogent manner.

---

[5] The government does not intend to elicit testimony about the defendant's prior conviction, incarceration, or supervised release status.

Similarly, the defendant's home was full of neo-Nazi imagery. In a room attributed to the defendant, agents located the following:

- A yellow envelope containing:

    o  fifteen (15) pendants, to include an Atomwaffen Division pin; and

    o  a swastika beaded necklace that contained a larger golden swastika pendant with "Terrorgram" inscribed along the side;

- A Silver color chain with Atomwaffen Division pendant;

- A black sun pendant, often referred to as a Sonnenrad;

- A drawing of a raccoon with the Atomwaffen Division symbol along its forehead; and

- A handwritten autobiography of the defendant

Here, the defendant's ties to the Atomwaffen Division reflect a long-term commitment to accelerationism, and the defendant's own view that he was acting in a line of fellow travelers who reached the peak of commitment by action, not simply words.

The government is mindful that racist or prejudiced beliefs, alone, are not grounds for criminal prosecution, but these beliefs, held in conjunction with criminal conduct, provide motive, intent, preparation, planning, knowledge, and absence of mistake. To turn a blind eye to them in the face of the rhetoric espoused by the defendant in various online mediums is to ignore significant, relevant evidence.

**2. Even if the Evidence is Not Intrinsic, it is Otherwise Admissible Under Fed. R. Evid. 404(b).**

Even if each of the statements and posts are not intrinsic—and they are—they are nevertheless admissible pursuant to Federal Rule of Evidence 404(b). Fed. R. Evid. 404(b) "prohibits evidence of other crimes, wrongs, or acts solely to prove a defendant's bad character, but such evidence may be admissible for other purposes, such as proof of motive, opportunity,

intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *United States v. Byers*, 649 F.3d 197, 206 (4th Cir. 2011) (internal quotation marks, citations, and alterations omitted). The rule is one of "inclusion, 'admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition.'" *United States v. Byers*, 649 F.3d 179, 206 (4th Cir. 2001) (quoting *United States v. Young*, 248 F.3d 260, 271-72 (4th Cir. 2001)).

The test for admissibility under Rule 404(b) has three parts. First, the evidence must be relevant to an issue other than character, such as identity, opportunity, knowledge, modus operandi, or intent. *United States v. Siegel*, 536 F.3d 306, 317 (4th Cir. 2008). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *E.g., United States v. Aramony*, 88 F.3d 1369, 1377 (4th Cir. 1996)). Second, the evidence must be "necessary," in that it is an essential part of the crimes on trial or furnishes part of the context for the crimes. *Siegel*, 536 F.3d at 319. Finally, the evidence must be reliable. *Id*. at 317. And it likewise must satisfy the requirement in Rule 403 that the probative value of the evidence must not be "substantially outweighed" by unfair prejudice. *Id*. at 319. The determination under Rule 403 is within the sound discretion of the trial Court. *United States v. Masters*, 622 F.2d 83, 87 (4th Cir. 1980).

Here, each statement satisfies the test for admissibility. First, as indicated in the notification, these statements will be used to prove the defendant's motive, intent, preparation, plan, knowledge, and absence of mistake in joining the conspiracy to attack electrical facilities in Maryland. They directly relate to facts of consequence, and make it more probable than not that the defendant intended to agree upon a plan to destroy the energy facilities in the greater Baltimore region. Nearly every statement either discusses or alludes to the destruction of critical

16

infrastructure, with the vast majority focusing on electrical infrastructure. The defendant cannot feign ignorance about his understanding of critical infrastructure, or the means or desire to destroy substation transformers. Coupled with more direct statements taken by CHS-1, he cannot pretend that he was involved in the planning of an attack, nor can he suggest that the actions of others taken in response to his urging were merely the result of "free speech and express[ions of] his personal feelings and opinions."

Second, the statements are necessary to contextualize the defendant's conduct. The motivations to commit most crimes are often readily apparent. Jurors can almost immediately conceptualize why someone may commit a robbery, financial fraud, or aggravated assault. Explaining why someone might be motivated to shoot at a substation transformer, without context, is far more difficult. Here, these statements provide that context. The defendant and Clendaniel wanted to bring about the destruction of society (starting with the electrical grid) because of their shared disdain for all non-white people. These comments further illustrate the advanced planning and resolve to do so. The use of "Mylar balloons to short transformers and melt wires" is a plan just as much as "putting holes in transformers."

Posting maps that provide locations for transformers and lamenting that others do not follow the actions of a successful shooting attack on them all are necessary to understand exactly why and what the defendant intended during the conspiracy. The statements will allow the jury to see the difference between broadcasting plans of putative criminal acts (as by posting "Make it Count" or an infrastructure map in a chat group)--including exasperation with the fact no one had executed the recommended attacks, and the actual planning of an attack in one-to-one communications, including discussions of specific targets. The movement from general encouragement of attacks, to specific planning for an attack underscores both the motive and

absence of mistake in the defendant's conspiracy with Clendaniel. Furthermore, it is the preexisting desire to damage infrastructure that underscores the unique opportunity it was that Clendaniel wanted to take immediate action and was willing to take direction from the defendant.

Finally, the proffered evidence here satisfies the element of reliability. The reliability of the evidence will be established by a preponderance of the evidence, *see Huddleston v. United States*, 485 U.S. 681 (1988) (standard of proof for prior acts under Rule 404(b) is preponderance of the evidence), and, in any event, defense counsel will have the ability to test its reliability at trial.

Thus, even if the Court determines that the statements are not intrinsic evidence, they are still nevertheless admissible under Fed. R. Evid. 404(b) at least as motive, opportunity, intent, plan, and absence of mistake evidence. Likewise, for the reasons already discussed above, no unfair prejudice will result were the Court to admit evidence. In any event, a curative instruction for any 404(b) evidence that is admitted—potentially given both at the time the evidence is introduced and at the end of the case—will ensure that the evidence is not misused by the jury and will decrease the potential for any prejudice.

**3. The Defendant was Provided Sufficient Notice.**

**a. The Notice is Sufficient to Place the Defendant on Notice as to the Purpose and Reason for the Use of These Statements.**

The notice provided to the defendant is more than sufficient to place him on notice of the use of these. Given the recency of the amendment to Rule 404(b), and the dearth of in-circuit authority, the Advisory Committee Notes are particularly instructive. In pertinent part, they state,

> The earlier requirement that the prosecution provide notice of only the "general nature" of the evidence was understood by some courts to permit the government to satisfy

18

the notice obligation without describing the specific act that the evidence would tend to prove, and without explaining the relevance of the evidence for a non-propensity purpose. This amendment makes clear what notice is required.

Fed. R. Evid. 404 adv. comm. note 2020 amend.

Here, the notice describes each act with specific detail, and further provides reference to the location of each act within the discovery. This includes specific dates for all acts, and in instances where the act constitutes a statement, direct quotes. It further explains the relevance of the evidence for non-propensity purposes. Motive, intent, preparation, planning, knowledge, and absence of a mistake are all issues that the government must address at trial. Their relevance, given the nature of the described acts, is abundantly clear. The defendant, in each act, is advocating for the destruction of critical infrastructure. Accordingly, the Court should deny the defendant's motion on these grounds.

> **b. Should the Court Determine that Notice is Insufficient, Supplemental Notice Can Cure Any Deficiencies.**

Should the Court determine that notice is deficient, the appropriate remedy would not be exclusion, but rather an opportunity for the government to supplement the notice. As the Advisory Committee Notes state, "Notice must be provided before trial in such time as to allow the defendant a fair opportunity to meet the evidence, unless the court excuses that requirement upon a showing of good cause." Fed. R. Evid. 404 adv. comm. note 2020 amend. There is no brightline time frame for such notice to occur, but courts in this circuit have held that one week has been sufficient to meet the requirements of 404(b). *See, e.g. United States v. Cohen*, No. CR. WDQ-14-0310, 2015 WL 2261661, at *32 (D. Md. May 7, 2015), aff'd in part, appeal dismissed in part, 888 F.3d 667 (4th Cir. 2018); *United States v. Graham*, 468 F.Supp.2d 800, 802 (E.D.N.C.2006); *United States*

*v. Savage*, No. 5:12-CR-351-F-1, 2013 WL 719492, at *2 (E.D.N.C. Feb. 27, 2013); *United States*

*v. Artis*, No. 5:12-CR-202-D, 2012 WL 4893957, at *1 (E.D.N.C. Oct. 13, 2012).

Here, the notice was provided on May 8, 2024, in contemplation of an original trial date of

July 12, 2024. The government became aware of a perceived deficiency on October 18, 2024,

before the then scheduled trial date of November 12, 2024. Trial is currently set to begin on January

27, 2025. As of the date of the filing of this motion, there are 83 calendar days until then. There is

no impediment to supplementing the notice, should the Court deem it necessary.

## CONCLUSION

For all of the above reasons, the defendant's motion *in limine* should be denied.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:    _____/s/_____

Michael F. Aubin
Joseph A. Baldwin
Assistant United States Attorneys

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **BRANDON RUSSELL** | * | **CRIMINAL NO. JKB-23-0056** |
| | * | |
| **Defendant.** | * | |
| | * | |
| | ******* | |

## <u>ORDER</u>

Upon consideration of Defendant's Motion in Limine to Exclude 404(b) Evidence and References to Neo-Nazism or the Atomwaffen Division, and the Government's Response in Opposition, it is, on this _____ day of _____, 2024, hereby

**ORDERED** that the Defendant's Motion is **DENIED**.

_____
Honorable James K. Bredar
Senior United States District Judge

21