IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO.  JKB-23-0056 |
| | : | |
| BRANDON CLINT RUSSELL, | : | ▇▇▇▇▇▇▇▇ |
| Defendant. | : | |
| | : | |

...oOo...

## GOVERNMENT'S *EX PARTE* MOTION TO WITHHOLD FROM DISCOVERY

The United States of America, by its undersigned attorneys, for good cause shown in accordance with Federal Rule of Criminal Procedure 16(d)(1), and consistent with Federal Rule of Civil Procedure 26.2(c), respectfully requests permission, *ex parte*, to withhold and/or defer from discovery ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

As set forth in the government's Motion for Protective Order regarding Undercover Witnesses (ECF 102), the government believes that the disclosure of the true identity of CHS-1 would seriously threaten the safety of CHS-1 and CHS-1's ability to continue to work in a covert capacity in other ongoing and future investigations. Moreover, any action that would disclose the identity of CHS-1's employer may threaten the safety of CHS-1's coworkers.

As further grounds for this motion, the government states as follows:

**RELEVANT FACTS**

I.     **Investigative Facts.**

The defendant, Brandon Clint Russell, was a founding member of a National Socialist Group called the "Atomwaffen Division," which advocated for racially or ethnically motivated violence. Beginning in about 2018, the defendant and his coconspirator, Sarah Beth Clendaniel, became acquainted by writing letters to each other when both were serving prison sentences in different institutions. At some point, they developed a romantic relationship that continued after their respective releases from incarceration.

The defendant and Clendaniel espoused a white supremacist ideology and were advocates of a concept known as "accelerationism." To "accelerate" or to support "accelerationism" is based on a white supremacist belief that the current system is irreparable and without an apparent political solution, and therefore violent action is necessary to precipitate societal and government collapse and start a race war.

Beginning in about June 2022, the defendant, using the moniker "Homunculus," communicated over an encrypted communication application (ECA #1) with a Confidential Human Source ("CHS-1"). Among other things, the defendant encouraged CHS-1 to carry out attacks against critical infrastructure in furtherance of the defendant's accelerationist ideology. He specifically encouraged CHS-1 to attack electrical substations and provided guidance on how to cause maximum damage, including as follows:

•     On September 9, 2022, the defendant told CHS-1 to read a white supremacist publication that provided instructions on how to attack critical infrastructure. The defendant urged CHS-1 to use Mylar balloons to short out a power transformer;

- On October 14, 2022, the defendant again talked to CHS-1 about the use of Mylar balloons for engaging in an attack on infrastructure. He then told CHS-1 that "putting holes in transformers though is the greatest thing somebody can do;"

- On October 25, 2022, after CHS-1 had provided the defendant with photographs of an electrical substation, the defendant stated that transformers are "custom made and could take almost a year to replace if there isnt [sic] any stocked replacement which they liekly [sic] don't have." In that same conversation, the defendant sent CHS-1 a link to the Wikipedia page for "Cascading failure." the defendant went on to ask CHS-1 how cold it gets in CHS-1's area, and indicated that CHS-1 should carry out an attack "when there is greatest strain on the grid," like "when everyone is using electricity to either heat or cool their homes;" and

- On November 5, 2022, the defendant asked CHS-1 if it was snowing in CHS-1's area yet and added: "i think you should wait until like a week after it starts snowing for that other thing we talked about." CHS-1 reported that the "other thing" was a reference to an attack on an electrical substation. The defendant also stated that the "goal is for when most people are using max electricity" and that "follow on [attacks] could lead to cascading failure costing billions of dollars." CHS-1 replied with an emoji of a shocked rubber duck.

On December 3, 2022, the defendant told CHS-1, "someone else i know in maryland…is gonna be doing same thing as you" and that this would "GREATLY amplify its effects." During the same conversation, the defendant confirmed he was referring to the "thing [CHS-1] sent pictures about," a reference to the photographs of an electrical substation provided by CHS-1 in late October.

On January 12, 2023, CHS-1 discussed the planned substation attack and told the defendant that CHS-1 wanted to "maximize impact" and "[w]ould love to coordinate to get multiple

3

[substations] at the same time." CHS-1 also alluded to the concept of cascading failure that the defendant had explained to CHS-1 during previous conversations. The defendant asked CHS-1 to collaborate with a Maryland-based woman to carry out the attacks and confirmed that the woman was 100 percent "serious and can be trusted." The defendant said that the woman was a "felon" who "had their weapon stolen" and was struggling to obtain a new weapon. The defendant asked CHS-1 to assist the woman the new weapon. The woman that the defendant referred to in this conversation, as well as in the December 3, 2022, conversation described above, was Sarah Beth Clendaniel.

Later that same day, Clendaniel, using the moniker "Nythra88," sent a message to CHS-1 on ECA #1. Clendaniel confirmed that she was the individual the defendant was referring to in the previous conversation between the defendant and CHS-1. In the ensuing conversation, which continued through January 14, 2023, Clendaniel told CHS-1 that she lived near Baltimore, that she had a terminal illness related to her kidneys and was unlikely to live more than a few months. She also stated that she was a felon, and had previously, but unsuccessfully, attempted to obtain a rifle. Clendaniel asked CHS-1 to purchase a rifle for her, stating that she wanted to "accomplish something worthwhile" before her death, and that she wanted the rifle "within the next couple of weeks" to "accomplish as much as possible before June, at the latest." Clendaniel then gave CHS-1 her username, @kali1889, for a different encrypted communication application ("ECA #2"), and said that they should have further communications using that application or that they should communicate in person.

On January 18, 2023, on ECA #2, Clendaniel told CHS-1 that she had already identified a few potential locations to target in her attack, including one just across the Delaware state line (with Maryland), in a location that is "literally like a life artery" and would "definitely cut out a

lot of shit." When Clendaniel told CHS-1 that she had just obtained her driver's license "today" and was not comfortable driving yet, CHS-1 stated that CHS-1 would have to be the "driver" and Clendaniel would have to be the "shooter" in the attack. Clendaniel confirmed that she was "determined to do this" and stated she would have done something earlier on her own if she had not lost her rifle "a few months ago." Clendaniel also told CHS-1 that she had an "eotech with a 4 times magnifier," which CHS-1 assessed to be a rifle optic, and that she had previously tried to obtain a rifle, a Smith & Wesson M&P 10 Sport, but that had fallen through. Clendaniel further stated that if CHS-1 provided her a rifle, CHS-1 should report the rifle as stolen and she would then file off the serial number. Clendaniel emphasized that her time frame for the attack was "no longer than a month."

The conversation continued shortly afterwards on ECA #1 after the ECA #2 call experienced technical problems. CHS-1 and Clendaniel continued to discuss the specifics of the desired rifle and agreed that Clendaniel would send CHS-1 a "wish list." Clendaniel admitted that whatever type of firearms she possessed would be "illegal." On or about January 19, 2023, Clendaniel sent CHS-1 a wish list of items for her desired rifle that were available for online purchase, along with magazines.

On or about January 19, 2023, the defendant and CHS-1 discussed on the telephone CHS-1's conversation the prior day with Clendaniel, including her ability to participate in the attack due to her health problems and possibilities regarding acquiring or manufacturing a rifle for her. The defendant told CHS-1 that he did not think CHS-1 and Clendaniel needed to be together at the same location during the attack. When CHS-1 asked whether they would need to attack substations near one other in order to achieve "cascading failure," the defendant said it "depends." The

defendant further stated that he would "look at the map" and get back to CHS-1 about target facilities in a couple of days.

On January 21, 2023, CHS-1 exchanged encrypted messages, separately, with Clendaniel on ECA #2 and the defendant on ECA #1 in which they discussed in more detail the rifle and specific accessories that Clendaniel wanted. The conversation with Clendaniel extended into January 22, 2023, at which time Clendaniel stated that she already had a "bunch of [.308] ammunition" and several magazines for a rifle. Clendaniel later clarified that she had a "few hundred rounds of ammunition." She also asked CHS-1 to provide her a "decent inner pants holster" for her "9mm" to replace her "other holster" which was a "drop leg holster" and therefore difficult to conceal.

On or about January 24, 2023, CHS-1 engaged in a nearly two-hour long conversation with Clendaniel. During the call, they discussed, among other things, the following:

- Clendaniel stated that she had threaded and non-threaded barrels for her Glock, which was functional after she purchased a new "slide" for it, and that she "keep[s] it on me now, like just in case." Clendaniel said she would send a picture of it to CHS-1 in the next day or two.

- Clendaniel discussed the ammunition she possessed, including .308 "full metal jacket" rounds, hollow point nine-millimeter rounds, and approximately 150-200 rounds of "Browning and Winchester." She also stated that she had a "Tri-Star" semi-automatic shotgun with a 10-round magazine that she could use instead of the desired rifle in the "worst case scenario."

- Clendaniel stated that her brother had some "incendiary rounds" with a green tip. Clendaniel suggested that, although the rounds were expensive, "getting that is, uh, I think especially for what we're talking about doing, just to make sure it's a solid thing and not just like the oil leaking out but like it's fully damaged."

6

- Clendaniel stated that she and CHS-1 needed to use "brass catchers," and she had thought about going to the firearms range to collect shells of different calibers, including .556, that they could spread "there" to send "them" on a wild goose chase.

- Clendaniel stated that she was hesitant to discuss targets of the attack with "Raccoon" (another alias for the defendant) because "he has a lot to lose." She added: "He's not like your average regular one of us that's not known and that's like a faceless unknown person . . . I try not to involve him wherever possible." Clendaniel and CHS-1 discussed physically scoping out some potential attack sites during the first week of February.

- Clendaniel and CHS-1 further discussed Clendaniel's desired rifle for the attack.

On or about January 26, 2023, CHS-1 and the defendant exchanged direct messages on ECA #1 during which CHS-1 advised CHS-1 had tentatively decided to buy a "pre-made" rifle for Clendaniel instead of 3D printing one. The defendant replied: "okay sounds good . . . everything else is fine too ;)'" When CHS-1 asked if the defendant was referring to "location," meaning the specific substation that would be targeted, the defendant replied "yes don't worry." CHS-1 stated: "Perfect. That's the part that I haven't really done anything on," to which the defendant again replied: "yea don't worry."

On or about January 29, 2023, CHS-1 received a message on ECA #2 from Clendaniel in which she stated that it "would really be ideal, for us both to have 30 round mags. Especially for what we're doing." She asked CHS-1 to "please get us each like, 4 of them. For what I'm hoping to do, we will need them. If we can pull off what I'm hoping... this would be legendary. This is MAJOR tier, and definitely doable."

7

That same day, Clendaniel sent CHS-1 via ECA #2 a link to the publicly available webpage "Open Infrastructure Map" (https://openinframap.org) and instructed CHS-1 to "look at Baltimore and see if you can figure out what I want to do."

Later on January 29, 2023, Clendaniel told CHS-1 that the five substations she planned to target included: "Norrisville, Reisterstown, and Perry Hall." Clendaniel described how there was a "ring" around Baltimore and if they hit a number of them all in the same day, they "would completely destroy this whole city." She added that they needed to "destroy those cores, not just leak the oil…" and that a "good four or five shots through the center of them . . . should make that happen." Further, she stated that: "[i]t would probably permanently completely lay this city to waste if we could do that successfully." When CHS-1 asked if it would accomplish a "cascading failure," Clendaniel replied: "Yes . . . probably" and that the attack targets are all "major ones." Clendaniel also said that the most difficult target that they would have to do together has "fire walls on three sides."

During that conversation, Clendaniel sent CHS-1 five links to the "Open Infrastructure Map" which showed the locations of five specific Baltimore, Gas and Electric ("BGE") electrical substations in Maryland. BGE is an energy company that utilizes substations, like the five targeted sites, to produce, convert, transform, regulate and distribute energy. Three of the five substations were located near the towns of Norrisville, Reisterstown, and Perry Hall. The remaining two substations were in the vicinity of Baltimore City, MD. Each location is a BGE substation with significant infrastructure.

On or about January 31, 2023, CHS-1 and the defendant discussed the targeted substations on ECA #1. CHS-1 told the defendant that CHS-1 had "read about a few attempt [sic] recently that didn't have much effect, so I want to make sure it's done right." The defendant replied "Yea, it

has been studied . . . So don't fret." When CHS-1 asked "[t]hese specific 5?," the defendant replied: "Look at the map dude." CHS-1 responded: "So that's the part I don't get. What's with the one all the way up by Pennsylvania? Does that have something to do with the cascading?" The defendant replied: "Watch this video" and provided a YouTube link to a video captioned "Grid vs. Gunfire" that discussed "What Really Happened with the Substation Attack in North Carolina." After watching the video, CHS-1 commented that CHS-1 is looking at the map and "I think I get it . . . But I only see four lines. Not fully getting the fifth. Is the one up north to stop rerouting? You know the one I'm talking about?" The defendant replied: "Yrs [sic]… It's a hard one though . . . Look at it from google maps." After indicating CHS-1 had pulled the location up on the map, CHS-1 replied "It looks like it's in a pretty rural area . . . Good road access . . . Wooded areas . . . I would like it to be closer to a major highway, but that has its ups and downs. The defendant replied: "Yea . . . Hard part is they have 3 sided firewalls . . . Look at them." CHS-1 replied: "Oh shit. Yea this is that one. Our friend mentioned that one did but she didn't say which one." Clendaniel and the defendant believed that attacking these five electrical substations in the greater Baltimore area would serve the purpose of accelerationism, i.e., the attack would serve to break down society, start a race war, and allow a white ethnostate to be built back in its place.

**II.    Written Statements.**

Government counsel has met with one of those witnesses (CHS-1) on multiple occasions, as part of trial preparations. During the first meeting, which occurred on June 12, 2024, government counsel learned for the first time that CHS-1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

███████████████████████████

On September 26, 2024, in preparation for trial, members of the prosecution team spoke with CHS-1 ███████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

---

[1] The Government previously filed an *ex parte* motion that referenced this matter before ultimately withdrawing it. *See* Dkt. 112.  Another ex parte motion was filed and then denied without prejudice to refiling.



### III.    Anticipated Testimony of CHS-1.

As already indicated in government's Motion for Protective Order (ECF 102) and Reply (ECF 108), and as suggested in the "Investigative Facts" above that discuss communications CHS-1 was involved in, CHS-1's anticipated testimony will be directed toward establishing the

authenticity and substance of certain text and voice communications between CHS-1 and Russell, and CHS-1 and Clendaniel. All of those online communications were captured by the witnesses in the form of screenshots or computer captures; images that the government expects to introduce into evidence. CHS-1 will also testify about his voice conversations with Russell and Clendaniel, all of which were recorded and will be offered into evidence as well. The testimony will consist *solely* of identification of the CHS-1's communications with the defendant and Clendaniel, communications which are in writing or recorded, and therefore, are objectively verifiable.

## ARGUMENT

### I.    Legal Standard

Although Rule 26.2 motions and Jencks Act motions are technically different motions, "Rule 26.2 incorporates the relevant provisions of the Jencks Act without substantive change" so the analysis of the two motions is the same. *United States v. Smith*, 31 F.3d 1294, 1301 n.6 (4th Cir. 1994), cert. denied, 513 U.S. 1181 (1995) ("We note, however, that because Rule 26.2 incorporates the relevant provisions of the Jencks Act without substantive change . . . , the result here would be the same if analyzed under the Rule rather than the Act.").

The Jencks Act provides that on a motion by the defendant after a witness for the government has testified on direct examination, the district court must order the government to "produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). If the United States claims that any statement to be produced "does not related to the subject matter of the testimony of the witness," then the court "shall excise" the portions of such statement "which do not relate to the subject matter of the testimony of the witness." 18 U.S.C. § 3500 (c).

In pertinent part, the Jencks Act defines "statement" to include "a written statement made by said witness and signed or otherwise adopted or approved by him," § 3500 (e)(1), and "a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously," § 3500 (e)(2). The statutory phrase "which relates to the subject matter as to which the witness has testified" is not further defined in the statute. 18 U.S.C. § 3500 (b), (e).

II. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are not a "written statement" made by CHS-1.

In *Palermo v. United States*, the Supreme Court explained that only witness statements "which could properly be called the witness' own words" and "reflect fully and without distortion what had been said to the government agent" are producible under the Jencks Act. 360 U.S. 343, 352 (1959). The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment." *Id*. at 349; *see also*, *United States v. Wenzel*, 311 F.2d 164, 171 (4th Cir. 1962) (the Jencks case and statute "each had the purpose of affording opportunity for impeachment of a witness"). But the Supreme Court also recognized the Congressional feeling behind the Jencks Act that it would "be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness's own rather than the product of the investigator's selections, interpretations, and interpolations." *Palermo*, 360 U.S. at 350.

While a statement need not have been written or signed by the witness, if the statement is not the witness' actual words, it must in some way have been adopted or approved by the witness to qualify as Jencks material. *United States v. Roseboro*, 87 F.3d 642, 645 (4th Cir. 1996); 18 U.S.C. § 3500(e).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



██ "relate to the subject matter" to which CHS-1 is anticipated to testify.

   III.   ██████████████████████████ **"Do Not Relate" to "the Subject Matter as to which" CHS-1 is Expected to Testify.**

The Government submits that the Court can determine, through reference to the anticipated testimony of CHS-1, that ████████████████████ do not relate to the anticipated testimony of CHS-1 within the meaning of the Jencks Act. ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ they "do not relate" to the scope of CHS-1's anticipated testimony. To the extent the Court determines in light of its review that some disclosure is necessary (which the Government expressly does not concede), in light of the security concerns for CHS-1 and others, the Government requests that the Court authorize a delay in the production of these putative Jencks materials of CHS-1 until no earlier than three business days prior to trial but preferably not until CHS-1 has completed direct testimony as contemplated by the Jencks Act.

When a defendant demands by properly founded motion the production of a "written statement" of a witness who has testified on direct examination, but the United States claims that the statement "contains matter which does not relate to the subject matter of the testimony of the witness," the court shall order the United States to deliver such statement and the court "shall

excise" the portions of such statement which do not relate to the subject matter of the testimony of the witness. 18 U.S.C. § 3500 (b), (c); Fed.R.Crim.P. 26.2 (a) & (c). Therefore, not only must a court identify Jencks acts materials that relate to the subject matter as to which the witness has testified, but the court must also identify (for exclusion) "portions of such statement which do not relate to the subject matter of the testimony." *Id*. Generally, as a matter of practice, this makes it "impossible for the district court to intelligently resolve the issue until after the witness has testified at trial." *United States v. Lewis*, 35 F. 3d 148, 151 (4th Cir.1994).[2]

"Because a court cannot permit a defendant to inspect government documents thought to qualify as statements in order to argue whether it should be allowed to see them [], the Jencks Act vests trial judges with the affirmative duty of administering the Act by deciding whether government documents relating to witness testimony are to be safeguarded or produced." *Roseboro*, 87 F.3d at 645 (internal citations omitted). The district court is required to conduct an independent inquiry of the materials to determine whether the material must be disclosed. *United States v. Savage*, 885 F.3d 212, 220–21 (4th Cir. 2018), citing *United States v. Boyd*, 53 F.3d 631, 634 (4th Cir. 1995). However, "[d]istrict courts have 'substantial latitude' in deciding what this inquiry will entail." *Boyd,* 53 F.3d at 634 (quoting *United States v. Smith*, 31 F.3d 1294, 1301 (4th Cir. 1994), cert. denied, 513 U.S. 1181 (1995)); *Savage*, 885 F.3d at 220.

Accordingly, the Fourth Circuit has looked to the actual testimony presented at trial to determine both the sufficiency of a defendant's demand for Jenck's production, and the degree of

---

[2] The Fourth Circuit has held that the district court may not require the government to produce Jencks Act material relating to one of its witnesses until after the witness has testified. *United States v. Lewis*, 35 F.3d 148, 151 (4th Cir. 1994). This procedural time is grounded on the language of the applicable statute and rule. 18 U.S.C. § 3500(a); Fed. R. Crim. P. 26.2(a). The Government may voluntarily provide putative Jencks material to the defense prior to the time required by the Jencks Act or the Rule.

15

relatedness (or lack thereof) between a written statement of a witness and that witness's testimony at trial. In *United States v. Boyd*, the Fourth Circuit identified the topics that an agent's testimony was "primarily limited to," but found that the defendant "failed to provide even the barest foundation for his assertion that the information contained in the eleven reports *related to* [the agent's] *testimony on direct examination*." 53 F.3d 631, 634 (4th Cir. 1995) (emphasis added). *Boyd* stands for the proposition that it is the defendant's threshold obligation to tie the subject matter of a witness's testimony to a request for Jencks.

In *Lewis*, the Fourth Circuit answered the "relates to testimony" issue by looking to a "fair characterization" of the subject matter of an agent's trial testimony and comparing it to an OIG report authored by that agent. *Lewis*, 35 F.3d at 149-50, 152. The testimony of the agent (Barbat) consisted of three topics: "(1) the interview with Lewis, (2) Lewis's relationship with the management of the apartment complex, and (3) the nature of Lewis's employment and her compensation during the relevant time period." *Lewis*, 35 F.3d at 152. The court had no difficulty determining that the summaries of interviews of three witnesses who testified at trial contained within the OIG report (including Barbat) should have been produced, but also found that the remainder of the substantial OIG report (that was the written statement of Barbat)—including short summaries of interviews of six other witnesses regarding the subject matter of the case—should be redacted from the OIG report before production. *Id*. Thus, though certain portions of the OIG report related to the case, those portions were not producible under Jencks because the did not relate to the topics of Barbat's testimony.

Distinguishing among the topics in a case and topics in particular testimony has also been drawn by other courts. The Court of Appeals for the Circuit of the District of Columbia addressed this issue as follows:

16

> While we recognize that the term "relates to" is very broad in isolation, we note that the object of the prepositional phrase is "the subject matter *as to which the witness has testified*" (emphasis added), *not* the "subject matter of the proceeding" generally. It is therefore problematical in our view whether the summary of facts in the memorandum "relates to" Jervis's direct testimony regarding the phone calls or the sanction recommendation in the manner envisioned by the Act. *Cf. United States v. Smaldone*, 544 F.2d 456 (10th Cir.1976) (holding that a document summarizing a witness's general knowledge of drug trafficking in Denver, in which Smaldone was discussed, did not "relate to" the witness's trial testimony describing a particular drug transaction with Smaldone). The details contained in Jervis's memorandum "relate to" the phone call and sanction portions of Jervis's testimony only in the extremely attenuated sense that any fact about the case bears some "relation" to any testimony in the case.

*Norinsberg Corp. v. U.S. Dep't of Agric.*, 47 F.3d 1224, 1229 (D.C. Cir. 1995). Thus, the "relates to" provision "serves" to snure that only documents overlapping with the subject matter of the testimony—and so potentially containing inconsistencies—need be disclosed. *Id*. The determination of what constitutes producible Jencks material is therefore a fact laden determination in this and a neighboring circuit.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ do not "relate to the subject matter of the testimony of the witness." *See U.S. v. Bin Laden*, 397 F.Supp.2d 465, 501-2 (S.D.N.Y. 2005) ("only a statement related to a witness's testimony is producible"). The anticipated testimony of CHS-1 will focus on particular text and oral communications between CHS-1 and Russell or Clendaniel that occurred at least 12 months prior ▮▮▮▮▮▮▮▮▮▮▮▮ The temporal (in or before February 2023) and factual (actual discussion of an attack plan) scope of the anticipated

17

testimony will be, of necessity, distinct and unrelated  "related to" the anticipated testimony (if at all) in an extremely attenuated sense.

Furthermore,  including the Criminal Complaint, and the Statement of Facts in support of Clendaniel's plea. There is nothing ▓▓▓▓ that the defense could use for purposes of impeachment or for any other relevant purpose under the circumstances of this case and this particular witness. Moreover, ▓▓▓▓ do not overlap with the anticipated testimony in a way that would be useful for impeachment.

### IV. If Any Material Is Deemed to "Relate to the Subject Matter as to which the Witness Has Testified," It Should Be Withheld Until After Direct Examination of the Witness.

The Court has directed that the Government address the existence of, authority for, and requisite findings to support procedures regarding materials it may find producible under *Jencks*, including withholding information on the grounds of witness safety or other grounds, or by ordering the Government to produce summaries of the materials. Dkt. 192 at 3. There is no basis in the Jencks case law for production of summaries of the materials in this case. Rather, should the Court determine that some production is required under Jencks, the Government simply requests that the Court follow the direction, timing, and sequence of the Jencks Act and Fed.R.Crim.P. 26.2 and require production only after the testimony of CHS-1 has been entered. The Government requests that the Court place restrictions on the dissemination of the materials by

defense counsel, including that the defendant only be permitted to review the materials in the presence of counsel without keeping or making a copy of any of the text.

The Government will comply with any related Giglio obligations, if any, in time for the defendant to make use of the information at trial. Accordingly, because the Government will comply with both the Jencks Act and any Giglio obligations, there is no obstacle to the requested relief under the Due Process Clause, the Confrontation Clause, or any other constitutional provision.



The government submits that the very serious safety risk to CHS-1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ greatly outweigh the defendant's interest in early production (if any) ▮▮▮▮▮▮▮▮

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court enter an order permitting it to defer any required Jencks production ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ until after CHS-1 has testified on direct examination.

A proposed Order is attached for the Court's consideration.

                                                                                Respectfully submitted,

                                                                                Erek L. Barron
                                                                                United States Attorney

By:    JOSEPH BALDWIN *(Digitally signed by JOSEPH BALDWIN, Date: 2024.12.03 00:12:20 -05'00')*
                                                                                Joseph R. Baldwin
                                                                                Michael F. Aubin
                                                                                Assistant United States Attorneys