## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | **Crim. No. JKB-23-0056** |
| **BRANDON CLINT RUSSELL,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## AMENDED MEMORANDUM AND ORDER

On February 4, 2025, a federal jury found Defendant Brandon Clint Russell guilty of conspiracy to damage an energy facility in violation of 18 U.S.C. § 1366(a). (*See* ECF Nos. 25, 231.) At trial, one of the Government's key witnesses was an undercover informant who testified under the pseudonym "Christopher Jackson."[1]  Jackson testified as to conversations he had with Russell and Russell's co-conspirator, Sarah Beth Clendaniel, regarding their plot to destroy various electrical substations near Baltimore, Maryland.  On direct examination, Jackson testified that he "received approximately $70,000" in payment for his work for the FBI over the preceding four years. (ECF No. 235 at 4.) He confirmed this fact on cross-examination. (*Id.* at 113.)

On March 19, 2025, after Russell had been convicted and with his sentencing pending, the Government docketed correspondence indicating that it had failed to disclose to Defense counsel that, on the evening of January 27, 2025—the first day of jury selection and two days before Jackson's testimony—the FBI paid Jackson an additional sum of $7,180.11. (ECF No. 236.) Government counsel represent that they learned of this payment only on March 7, 2025. (*Id.*)

On March 25, 2025, Russell filed the instant Motion for New Trial, arguing that the

---

[1] The Government and the Court has also at times referred to Jackson as "CHS-1." (*See generally, e.g.*, ECF No. 211; *see also* ECF No. 236-3 at 2.)

Government's failure to timely disclose this payment violated his right to receive exculpatory and impeachment information under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). (ECF No. 237.)

The Motion is fully briefed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the following reasons, the Motion will be denied.

## I.   Background

On February 14, 2023, a federal grand jury returned a single-count indictment charging Russell and Clendaniel with conspiracy to damage an energy facility in violation of 18 U.S.C. § 1366(a). (ECF No. 25.) In May 2024, Clendaniel pled guilty to a superseding indictment. (ECF No. 92.) Russell proceeded to trial. Prior to trial, the Court resolved numerous disputes between the parties regarding, *inter alia*: Russell's allegations that the Government planned to improperly use evidence obtained or derived from electronic surveillance conducted under the Foreign Intelligence Surveillance Act ("FISA") (*see generally* ECF Nos. 134–35, 143–44, 176–77); issues relating to witness confidentiality and potential restrictions on public access to the trial (*see generally* ECF Nos. 134–35, 151; *see* ECF No. 211 at 5–6); evidentiary issues relating to references to Russell's Neo-Nazi affiliations (*see* ECF No. 211 at 1–2); and the Government's disclosure obligations under the Jencks Act (*see id.* at 3–5).

Trial began on January 27, 2025, and lasted for five days, including jury selection. Jackson was the third witness to testify.

Jackson began his direct testimony by explaining that he worked as a "confidential human source" ("CHS") for the FBI. (ECF No. 235 at 3.) He stated that as a CHS, he was not an employee of the FBI, but was instead an independent agent who would "go into online spaces, whether it be on [the messaging app] Telegram or in other places, to identify potentially illegal activity or those

2

that would like to do violence." (*Id.* at 4.) Jackson testified that he had worked as a CHS for "[a]round four years" and that, over the course of those four years, he "received approximately $70,000" from the FBI. (*Id.*) Of that amount, he said, "about 40,000" was for "actual payment," and "30,000 was [for] reimbursements for various expenses that [he had incurred] in the course of this work," such as purchasing a separate phone and buying airplane tickets. (*Id.* at 4–5.)

Jackson testified that, around June of 2022, he first became aware of a Telegram user who went by the name "Homunculus."[2] (*Id.* at 7.) Homunculus had posted on Telegram a manifesto called "Make It Count," which espoused a violent white supremacist ideology and, among other things, exhorted readers to destroy the electrical grid as a means of subverting society. (*Id.*) Jackson downloaded "Make It Count," and the document was introduced into evidence. (*Id.* at 9– 10.) Jackson eventually began messaging with Homunculus directly on Telegram. Jackson testified to the content of his text conversations with Homunculus, which Jackson had preserved by taking screenshots. (*See generally id.* at 8–19.) Jackson testified that, among other discussions, Homunculus encouraged him to shoot electrical substations to cause a "cascading failure" of the electrical grid, ideally after a winter snowstorm so as to destroy the system when the demand on the grid is at its peak. (*See generally id.* at 28–60.) "Putting holes in transformers," Homunculus told Jackson, "is the greatest thing someone can do." (*Id.* at 28.) These discussions began as fairly abstract, but evolved into planning for a specific attack in the fall of 2022 after Homunculus learned that Jackson lived in Maryland. Homunculus said to Jackson, "someone else I know in Maryland . . . is going to be doing the same thing as you." (*Id.* at 43–44.) Homunculus explained that this other individual, who went by the alias "Nythra," wanted to mount an attack against

---

[2] Jackson explained that Homunculus also at times went by the aliases "Ouroboros" and "Raccoon" (*id.* at 19–23, 27); for consistency, the Court will refer to the user as "Homunculus" even when this individual was actually using a different username at the time of the message being discussed.

3

electrical substations but was unable to obtain a firearm because of a prior felony conviction; he asked Jackson if he could help her by obtaining a gun and 3-D printing some accessories, and he shared Jackson's contact information with her. (*Id.* at 44–51.) Jackson testified about further conversations he had with Homunculus after Jackson had connected with Nythra, including additional discussions about logistical details such as the location and timing of the planned attack. (*Id.* at 48–60.) These conversations, which included text communications and one phone call (which was recorded and an excerpt of which was played for the jury), lasted until January 2023. (*Id.*) Homunculus's statements to Jackson suggested that Homunculus had been separately communicating with Nythra directly about the plan. (*See, e.g.*, *id.* at 53 (Homunculus stating, in response to Jackson's question about whether the location for the planned attack had been identified, "[y]es, don't worry"); *id.* at 57 (Homunculus stating, in response to Jackson's questions about the viability of the plan, that "it's been studied so don't fret").)

Jackson also testified about conversations he had with Nythra, who also sometimes went by "Kali." As with Jackson's testimony about Homunculus, all of Jackson's testimony about Nythra referred to conversations that were recorded, and these recordings were shown to the jury, either in the form of screenshots of textual conversations or audio playbacks of telephone calls. (*See generally id.* at 60–98.) These conversations indicated that Nythra had known Homunculus for several years, that Homunculus had "vouched" for Jackson, and that Nythra was familiar with "openinframap," a website containing information about infrastructure that Homunculus had repeatedly publicized. (*Id.*) Jackson testified to his conversations with Nythra about their planned attack against electrical substations around Baltimore.

On cross-examination, Defense counsel inquired as to how Jackson became an FBI informant and into Jackson's day job working for a federal contractor. (*Id.* at 99–113.) Jackson

4

again testified that he received approximately $70,000 from the FBI over the course of four years. (*Id.* at 113.) Jackson stated that he "understood there might be compensation," but that "it was made clear that it would be irregular and there was no formal agreement for payment." (*Id.*)

Other witnesses gave testimony that tended to show that Homunculus/Ouroboros/Raccoon was Russell, and that Nythra/Kali was Clendaniel. For example, FBI agent Andrea Bedford testified as to a forensic analysis of devices obtained from a search of Russell's residence, which indicated that Russell was associated with the usernames "Raccoon," "Homunculus," and "Ouroboros." And FBI agent Terryan Burns testified that she retrieved a cell phone from a search of Clendaniel's residence, and that a forensic analysis of the phone uncovered chat conversations between "Nythra" and "Teddy K," an alias for Jackson.

Finally, other evidence at trial further tied Russell to the conspiracy. The Court will not recite all of that evidence, but will review some key points. Evidence introduced revealed that Russell harbored extreme white supremacist views; that he subscribed to an ideology called "accelerationism," which holds that society is irredeemably corrupted and that the only solution is to precipitate societal collapse leading to a race war that will result in the victory of the white race; that he believed that targeting the electric infrastructure was one of the most effective ways to bring about societal collapse; that he had extensively researched how to destroy electrical substations; that he openly encouraged individuals in online groups to carry out attacks on electrical infrastructure; that Russell directly communicated with Clendaniel during the same time period that he and Clendaniel were discussing the planned attack on substations with Jackson; and that he was deeply concerned with secrecy and "operational security" such that he frequently took steps to delete messages and other information from his devices. A witness from Exelon, the utility company that owned the targeted substations, testified that, if the attack had succeeded, the damage

5

would have been at least in the millions of dollars in direct equipment and repair costs. Forensic evidence uncovered from a search of Clendaniel's phone also revealed text conversations between Russell and Clendaniel in which the two discussed their conversations with Jackson (whom they referred to by his online alias, "Teddy K"), and in which Russell shared a map with Clendaniel which he then deleted from his computer; and that Clendaniel and Russell spoke by phone for about half an hour immediately after that text conversation on the same day that Clendaniel was discussing logistical details of the planned attack with Jackson. There was also evidence of large amounts of rifle ammunition recovered at Clendaniel's residence.

This evidence, taken collectively, allowed a reasonable jury to conclude at a minimum that: Russell knew that Clendaniel wanted to attack electrical substations; Russell was highly sympathetic to this objective; Russell agreed to help Clendaniel by advising her about logistical operations of the attack such as identifying the locations to target and by connecting her with someone who (he thought) would procure for Clendaniel a firearm with which to perpetrate the attack; and that the attack would (if successful) have resulted in at least millions of dollars in damage.

At the conclusion of trial on February 3, 2025, the jury returned a verdict of guilty. (ECF No. 231.)

## II.   Legal Standard

Rule 33 permits the Court, "[u]pon the defendant's motion," to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A defendant may file the motion any time within three years of the verdict, if the motion is "grounded on newly discovered evidence." *Id.* 33(b)(1). Here, the timeliness of Russell's Motion is not contested.

First, the Court clarifies the proper test to apply in evaluating the instant Motion. The

6

general rule for a Rule 33 motion is that a defendant seeking a new trial on the grounds of newly discovered evidence must show: "(1) the evidence is newly discovered; (2) the defendant exercised due diligence; (3) the newly discovered evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence would probably result in acquittal at a new trial." *United States v. Moore*, 709 F.3d 287, 292 (4th Cir. 2013) (citing *United States v. Chavis*, 880 F.2d 788, 793 (4th Cir. 1989)).

The Government argues that this five-part test (the "*Chavis* test") applies to Russell's Motion. (ECF No. 239 at 14.) But the demanding *Chavis* test does not apply when the "evidence was available to the prosecutor and not submitted to the defense." *United States v. Agurs*, 427 U.S. 97, 111 (1976); *see also United States v. Russell*, No. 24-6611, 2024 WL 5232848, at *1 (4th Cir. Dec. 27, 2024) (explaining that the *Chavis* test does not apply in this context); *United States v. Cargill*, 134 F.3d 364 (Table), 1998 WL 39394, at *4 (4th Cir. Feb. 2, 1998) (same). Under *Brady* and *Giglio*, the Government has a constitutional duty to disclose exculpatory and impeachment evidence in its possession to the defense. *See United States v. Bagley*, 473 U.S. 667, 675 (1985). When a defendant seeks a new trial on the basis of a *Brady/Giglio* violation, he must show that the "evidence was (1) favorable to the accused, (2) suppressed by the government, and (3) material to the verdict at trial." *United States v. Chavez*, 894 F.3d 593, 600 (4th Cir. 2018) (quoting *Nicolas v. Att'y Gen. of Md.*, 820 F.3d 124, 129 (4th Cir. 2016)).

Having determined the applicable test, the Court turns to the substance of the *Brady* test.[3]

---

[3] Russell's reply brief contains a passing citation to *Napue v. Illinois*, 360 U.S. 264, 269 (1959). (ECF No. 241 at 4.) Under *Napue*, "the government may not knowingly use false evidence, including false testimony, to obtain a tainted conviction or allow it to go uncorrected when it appears." *Juniper v. Davis*, 74 F.4th 196, 211 (4th Cir. 2023). To bring a *Napue* claim, the defendant must show (1) falsity, (2) materiality, and (3) "the prosecutor's knowledge of its falsity." *Id.* (citation omitted). The materiality standard in the *Napue* context is less demanding than for regular *Brady* claims. *Id.* But, even assuming *arguendo* that Russell could show materiality for the purposes of a *Napue* claim, there is no indication that the prosecutors knew at the time that Jackson's testimony was false. *See Chavez*, 894 F.3d at 601 ("[A] *Napue* violation can be

In analyzing a potential *Brady* violation, the Court draws "no distinction between exculpatory and impeachment evidence." *Nicolas*, 820 F.3d at 129. Moreover, the defendant need not "satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal." *Agurs*, 427 U.S. at 111; *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

To the extent that the Government's brief takes up the *Brady* analysis, it focuses exclusively on the third element, materiality. (*See* ECF No. 239 at 18–23.)[4] So, that is where the Court will focus too. "Materiality 'is not a sufficiency of the evidence test,' and a defendant 'need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.'" *Nicolas*, 820 F.3d at 130 (quoting *Kyles*, 514 U.S at 434–35). Instead, the test is whether there is a "reasonable probability of a different result" had the evidence been disclosed. *Kyles*, 514 U.S. at 434 (citation omitted). "Evidence is material under *Brady* if it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Chavez*, 894 F.3d at 600 (quoting *Kyles*, 514 U.S. at 435); *Monroe v. Angelone*, 323 F.3d 286, 302 (4th Cir. 2003). In assessing materiality, the Court considers the import of the witness's testimony not in isolation but in "the context of the entire record." *Bowman v. Stirling*, 45 F.4th 740, 743 (4th Cir. 2022) (quoting *Turner v. United States*,

---

found only for *knowingly* offering or failing to correct false testimony . . . ." (emphasis in original)); *cf. Vinson v. True*, 436 F.3d 412, 420 n.3 (4th Cir. 2006). So, to the extent Russell should be understood to bring a *Napue* claim, that claim is unavailing.

[4] The Government does not contest that the other elements of a *Brady* violation are established. The evidence was unquestionably favorable to Russell in that it had impeachment value. *See Nicolas*, 820 F.3d at 129. As for the second element, the Court will assume, without deciding, that Government counsel had a duty to learn of the FBI's January 27 payment to Jackson. The Court sees no reason to think that the failure to disclose this payment was intentional or due to bad faith on the part of Government counsel, but "*Brady*'s commands do not stop at the prosecutor's door; the knowledge of some of those who are part of the investigative team is imputed to prosecutors regardless of prosecutors' actual awareness." *United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010) (citing *Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.")).

324–25 (2017)).

## III.    Analysis

Courts must conduct a searching inquiry of the nature and circumstances of the error when it comes to light after a criminal trial that the testimony of a Government witness was less than completely accurate. Prosecutors are held to a higher standard than that applicable to ordinary litigants. *See United States v. Rolle*, 204 F.3d 133, 138 n.7 (4th Cir. 2000); *see also Model Rules of Pro. Conduct* r. 3.8 cmt. 1 (Am. Bar Ass'n 1983) ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.") The Court does not take lightly any credible suggestion that the Government may not have lived up to its obligations. In such a circumstance, the Court must carefully scrutinize the nature of the Government's error and the impact that the error had on the fairness of a trial.

Here, the Court is satisfied that the Government's failure to disclose the January 27 payment to Jackson—while unfortunate—was not so grave as to undermine confidence in the jury's verdict. Accordingly, the evidence was not material for the purposes of the *Brady* analysis, and Russell is not entitled to a new trial.

### A.  The Impeachment Value of the Suppressed Evidence Was Minimal

To some extent, of course, evidence that reveals a witness's possible bias or that otherwise tends to undermine a witness's credibility is almost always relevant. *See United States v. Smith*, 451 F.3d 209, 221 (4th Cir. 2006). But in this case, Jackson's credibility was simply not a major issue at trial. Indeed, "the limited focus of [Jackson's] testimony" was key to the Court's decision to grant the Government's request to permit Jackson to testify under a pseudonym and in light disguise. (ECF No. 134 at 4 (quoting *United States v. Ramoz-Cruz*, 667 F.3d 487, 501 (4th Cir. 2012)).) As the Court explained in its decision at the time, "[i]t is the Court's understanding . . .

9

that the Government does not intend to elicit testimony from the witness[] about [his] own impressions of the conversation[s], nor does the Government intend to elicit testimony about other, uncorroborated conversations." (*Id.*) The Court expected that "the jury [would] not be confronted with uncorroborated testimony whose truth rises or falls on the witness['s] credibility." (*Id.* at 5.) To be sure, as the Court later recognized, while Jackson's testimony was expected to be "limited in *focus*," it would not necessarily be "limited in *importance*." (ECF No. 151 at 5 n.3.) But Jackson's role at trial was expected to be "important not for [his] own testimony, but for [his] role as [a] vehicle[] for introducing into evidence Russell's own words," as well as those of Clendaniel. (ECF No. 134 at 4.)

The Court's expectations about the limited scope of Jackson's testimony were borne out at trial. His testimony was limited almost exclusively to authenticating records, either of textual communications or phone calls, between himself and the co-conspirators. He never expressed his own personal opinion on, for example, what he thought Russell's subjective motivations were, or what actions he thought Russell may or may not have taken in relation to the conspiracy, or who else he thought Russell may or may not have been corresponding with. As the Court noted during a conference with counsel at the bench during trial, "as forecast[ed] in the pretrial phase of the case," Jackson "testified at some length but really just as a conduit for the admission of admittedly voluminous records of communications in which he was a participant." (ECF No. 235 at 108.) Jackson "wasn't asked his opinion of anything." (*Id.* at 109.)

There was no evidence that would suggest—for example—that the screenshots or call recordings were somehow fabricated; indeed, some of the conversations were independently corroborated by evidence unearthed from searches of the Defendants' electronic devices. Moreover, Russell's counsel did not contest but instead acknowledged during closing argument

10

that the conversations about which Jackson testified took place. Russell's defense focused mainly on the idea that the conversations reflected free speech protected by the First Amendment rather than a criminal conspiracy, and that Russell never joined the conspiracy but instead acted as a mere cheerleader. This defense had nothing to do with the veracity or credibility of Jackson's testimony—which again, was simply to the effect that Russell and Clendaniel made certain statements. Instead, Russell's defense focused on whether his statements—which Russell essentially conceded had occurred—rose to the level of criminality. The jury evidently did not find this defense persuasive, and they were entitled to so find.

### B. The Jury Was Already Aware That Jackson Had Been Compensated

To whatever extent that Jackson's potential pro-Government bias mattered, the jury was adequately apprised of the issue. As noted above, Jackson testified on both direct and cross-examination that he had received approximately $70,000 from the Government for his work on this case. And Defense counsel raised this issue again during closing argument, making the following statements:

> I told you that you would see lots of chat messages where both Brandon and Sarah and others were espousing these Neo-Nazi views to one another on line. I told you that these beliefs were repulsive to most and it would make you angry, but I asked you to set your personal feelings aside. I told you that the evidence would show that this conspiracy consisted of two individuals, Sarah Clendaniel and a person working for the government who we now know as Jackson, an individual the government paid tens of thousands of dollars for working for the FBI in an effort to trap Brandon Russell to make him a part of this conspiracy.

(ECF No. 240-5 at 9.)

Russell contends that the issue "is not merely the difference between $70,000 and $80,000 which is important to the instant motion—it is the witness's willful misrepresentation and failure to address the additional payments he received *during the course of the trial*." (ECF No. 241 at 3 (emphasis in original).) The Court understands Russell's point that the significance of the January

11

27 payment for impeachment purposes is not so much the additional amount of money, but rather the fact that Jackson received this payment days before his testimony and yet failed to disclose it. But, as to the timing of the payments, Jackson was never asked, nor did he say, *when specifically* the payments had occurred; he simply testified that he had received $70,000 during the preceding four years. (ECF No. 235 at 4, 113.) So, although Jackson never stated that he had received a payment on January 27, 2025, he also never gave any testimony that suggested that he had *not* received any recent payments—after all, at the time of trial, the "last four years" encompassed January 27. As for the discrepancy in the amount of money that Jackson testified to receiving, the Court has no basis for concluding that Jackson's statement that he received "approximately $70,000" when he should have said "approximately $80,000" reflected "willful misrepresentation" or dishonesty on his part, as opposed to an honest mistake or lack of attention to detail. Nor does the Court have any basis for thinking the jury would have so concluded.

### C. The Evidence at Trial Strongly Supported a Conviction

Furthermore, the Court considers Jackson's testimony in the context of the whole trial. As the jury was instructed, to convict Russell, the Government had to prove each of the following elements beyond a reasonable doubt: (1) that two or more people (not counting any government agent) entered into an unlawful agreement to knowingly and willfully damage the property of an energy facility; (2) that the defendant knowingly and willingly became a member of the agreement; and (3) that, if the object of the conspiracy had been achieved, the damage would have exceeded $100,000 or caused a significant interruption or impairment of a function of an energy facility.[5] (*See* Jury Instructions Nos. 31, 34A (ECF No. 220-1 at 38, 44).) The Court further instructed the

---

[5] As the Government observed in its proposed final jury instructions—and as Russell implicitly conceded by not objecting—there need not be any proof of an overt act to sustain a conspiracy conviction under 18 U.S.C. § 1366(a). (ECF No. 116 at 36 n.1); *see Whitfield v. United States*, 543 U.S. 209, 213–14 (2005); *accord United States v. Ojedokun*, 16 F.4th 1091, 1105 (4th Cir. 2021).

jury that, in order for him to have become a member of the conspiracy, Russell "must have intentionally engaged, advised, or assisted in it for the purpose of furthering the illegal undertaking." (Jury Instruction No. 34 (ECF No. 220-1 at 43)); *see also United States v. Grover*, 85 F.3d 617 (Table), 1996 WL 226262, at *10 & n.13 (4th Cir. 1996) (affirming conspiracy conviction where the district court gave a similar instruction); *cf. Ocasio v. United States*, 578 U.S. 282, 287–89 (2016) (discussing the role of a conspirator).

Here, with or without knowledge of the January 27 payment, the evidence of Russell's guilt presented at trial was compelling. As has been repeatedly noted, all of the conversations involving the Defendant to which Jackson attested at trial were recorded, and many details of Russell's online activities were independently corroborated through forensic analysis of his and Clendaniel's electronic devices. This evidence showed that Russell communicated directly with Clendaniel and actively sought to assist her in her attempt to destroy electrical substations in Maryland, with the goal of bringing about a cascading failure of the regional electrical grid. The Government also introduced abundant evidence reflecting Russell's motives and his almost obsessive attention to secrecy. Some of the evidence, while circumstantial, was powerful in indicating that Russell was an active participant in the conspiracy—for instance, the fact that Russell texted a map to Clendaniel, then stated that he had deleted the map from his computer, then immediately called Clendaniel on the phone for about half an hour (the contents of this call were not recorded), during the same late-January-2023 time period that Clendaniel revealed logistical details (including planned target locations) in her conversations with Jackson. This evidence, when considered in its totality, could forcefully lead a reasonable factfinder to the conclusion that Russell was an active and willing member of the conspiracy, even if he had no intention of personally carrying out the attack himself. *See Ocasio*, 578 U.S. at 288 (explaining that a conspiracy conviction requires that

the defendant "merely reach an agreement with the specific intent that the underling crime *be committed* by some member of the conspiracy," but that it is not necessary "that the defendant intended to commit the underlying offense himself" (emphasis in original) (internal quotation marks and citations omitted)).

Given the strength of the case against Russell, and given the relatively minor impeachment value of the suppressed evidence, it is not reasonably probable that a different outcome would have occurred at trial had the jury been apprised of the January 27 payment. To see why this is the case, it helps to imagine the chain of conclusions a juror would have had to reach in order for them to have reached a different verdict. A juror would have had to find Jackson's failure to reference the January 27 payment so damning that the juror entirely discredited his testimony; they would have had to further determine—despite no record evidence to this effect—that the screenshots and audio recordings corroborating Jackson's testimony were fabricated; and the juror would have also had to discount all the other evidence tying Russell to the conspiracy (for example, evidence of his motive, evidence of conversations between Russell and Clendaniel concerning guns and sharing of maps, and evidence of his pervasive focus on secrecy and "operational security"). This far-fetched scenario falls short of materiality. *Cf. Turner*, 582 U.S. at 326 (concluding that it was not "reasonably probable" that suppressed evidence "could have led to a different result at trial" when the jury still would have had to reach a variety of implausible conclusions in order to acquit).

## D. Conclusion

All of the above is not to say that the Government's error was trivial or a mere technical violation. The amount of undisclosed money that Jackson received—a little over $7,100—is about a ten percent increase over the $72,000 sum that the Government had previously disclosed to Defense counsel. In the Court's view, ten percent is just on the threshold of significance. And the

14

timing of the payment, occurring on the first night of trial and two days before Jackson's testimony, raises some concern. But in light of the limited nature of Jackson's testimony, the trove of evidence corroborating Jackson's testimony as well as independent sources of evidence tending to show Russell's participation in the conspiracy, the fact that Russell conceded during closing argument that the conversations about which Jackson testified had occurred, and the fact that the jury already knew that Jackson was compensated for his services, the Court cannot say that the Government's error was so serious as to undermine confidence in the verdict.

The *Brady* standard reflects the judicial system's "overriding concern with the justice of the finding of guilt." *Bagley*, 473 U.S. at 678 (quoting *Agurs*, 427 U.S. at 112). In the particular context of this case, the Court is satisfied that—notwithstanding the Government's omission—the jury's finding of Russell's guilt was just, and that there is no reasonable probability that a different result would have obtained had the jury been informed of the January 27 payment.

**IV.   Conclusion**

For the foregoing reasons, Russell is not entitled to a new trial. Accordingly, it is ORDERED that the Motion for New Trial (ECF No. 237) is DENIED.

DATED this 2nd day of May, 2025.

BY THE COURT:

/s/ JAMES K. BREDAR

James K. Bredar
United States District Judge